## Babey v. Commonwealth.

(Decided April 28, 1916.)

### Appeal from Jefferson Circuit Court (Criminal Division).

1. Criminal Law—Plea of Insanity—Evidence.—A witness in a criminal prosecution for murder, upon a question of insanity cannot state what opinion she expressed at some previous time to another, or what opinion the other person expressed to her, of the condition of defendant's mind.

2. Criminal Law—Trial—Conduct of Commonwealth's Attorney in Argument.—Statement in argument to the jury by the Commonwealth's attorney that: "The criminal records show that in cases of particularly horrible character, when there is no other salvation, the guilty criminal seeks the defense of emotional insanity and too often juries have been willing to accept the miserable pretense and free the red-handed criminal," was a legitimate deduction from the evidence and stated a general condition well known to the jury, and, therefore, not objectionable.

3. Criminal Law—Trial—Instructions.—In a prosecution for murder, instructions examined and found free from error.

4. Homicide—Trial—Instructions.—Where defendant shot his wife twice in a room where there were no eye-witnesses, and again outside in the presence of witnesses, the wife falling immediately and dying shortly after the third shot; and the court, upon the theory that it was for the jury to decide which shot was fatal, gave instructions on voluntary and involuntary manslaughter, accidental killing and self-defense, the rule in this jurisdiction requiring such instructions where there are no eye-witnesses to a homicide; it being evident that the jury were satisfied from the evidence that the third was the fatal shot, since they found defendant guilty of murder under another instruction defining that crime, the instructions in question could not have confused or misled the jury, hence were not prejudicial to the defendant.

5. Criminal Law—New Trial—Newly Discovered Evidence.—A new trial will not be granted for newly discovered evidence shown by affidavits of physicians and an uncle of defendant as to his suffering from a form of insanity progressive in character, caused by an inherited taint, where such affidavits do not show that at

the time of the commission of the crime defendant was insane, and where no attempt was made to secure such evidence on the trial and the new evidence is but an attempt to secure another trial upon an entirely new theory of defense.

LIEBER & HEIDENBERG, CHAPEZE & CRAWFORD and M. S. SANDFORD for appellant.

M. M. LOGAN, Attorney General, and D. O. MYATT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellant, Julius Babey, was tried in the Jefferson circuit court, criminal division, under an indictment charging him with the murder of his wife, Agnes Babey, whom he shot and killed in the city of Louisville, April 24, 1915. The jury by their verdict found him guilty of the crime charged and fixed his punishment at death. He complains of that verdict and the judgment entered thereon, hence this appeal.

The crime was admitted by the appellant and, according to the evidence, was deliberately planned and brutally executed. The motive therefor, shown by the evidence, was the institution by the wife, a few days previously, of an action against him for a divorce and the custody of their children. The bringing of the divorce suit seemed to have greatly angered appellant toward his wife and her mother, with whom she and her children were living because of his inability or unwillingness to support them. The only defense interposed by appellant on the trial was that he was insane at the time of the homicide and by reason thereof not responsible for his act. The grounds urged in support of the motion for a new trial in the court below and now relied on for a reversal of the judgment of conviction, are: (1) Alleged error of the circuit court in excluding competent evidence offered in his behalf on the trial; (2) Misconduct of the Commonwealth's attorney in making improper statements in argument to the jury; (3) Failure of the court to properly instruct the jury; (4) Newly discovered evidence.

In order that the questions thus raised may be understandingly disposed of, consideration of the material facts furnished by the bill of evidence will be necessary. In brief they are as follows: Appellant was twenty-four years of age when the crime was committed.

At the time of his marriage to the deceased he was nineteen years of age and she fifteen. Two children were born of this marriage, the elder being two years of age and the younger only five months old at the time of the homicide. Appellant seemed to have poorly provided for his family. Practically half of the time he spent away from them and his home, and when at home he was about half of the time without employment. When he was away from them the wife and children lived with and were cared for by her mother, Mrs. Kate Thorpe. Some months before the homicide appellant and his wife separated, he going to Chicago and she and the children to her mother's. During this period of separation he a part of the time had some sort of menial employment in a Chicago hotel, but contributed nothing to the support of his wife and children. When, shortly before the killing, the wife instituted suit for divorce in the Jefferson circuit court, and he was notified thereof by letter from the wife's attorney, he, according to his own testimony, began to drink heavily and in a day or two returned to Louisville, arriving there on Thursday, April 23d, and on that day attempted to borrow a pistol from an acquaintance, claiming that it was his purpose to kill a dog. On the following morning, between nine and ten o'clock, he went to the home of his wife's mother, Mrs. Thorpe, and meeting her said: "Hello, Mrs. Thorpe." He then held his right hand behind him with which he drew a pistol and shot Mrs. Thorpe in the right side. She caught or attempted to catch him but he jerked himself loose from her and entered an adjoining bedroom, where he found his wife and children. Mrs. Thorpe did not follow him into the room or see what happened after he entered it, but immediately heard two shots fired in the room, both of which were fired at and inflicted wounds upon the wife. Mrs. Thorpe then ran into the street calling for help and was followed by her daughter, appellant's wife, who ran out of the house screaming for someone to protect her little children from the death she feared appellant would inflict upon them. The wife and mother-in-law next observed appellant coming through the back yard and toward the street where they were, and, in order to protect themselves, ran down the street about half a block to the residence of a Mrs. Johnson, who happened to be standing in front of her house and invited them to enter it, which

they, with Mrs. Johnson, attempted to do; but upon reaching the front door and finding it locked Mrs. Johnson walked around the house to enter it from a back door and unlock the front door. While appellant's wife and mother-in-law were standing on the front steps awaiting admission to the house, he got to where they were before they could enter it. When he reached them his wife attempted to pass him and make her escape, but in doing so was again shot by him with the pistol, whereupon she fell and in a few minutes died. After thus shooting his wife appellant turned and attempted to again shoot Mrs. Thorpe, but was caught by her and so held as to prevent his shooting until two men, Shively and Evans, who were coming along the street at the time, came to her rescue and took charge of him. These men held him until an officer put him under arrest and lodged him in jail.

Con O'Leary, the policeman who placed appellant under arrest following the shooting, testified that the latter, without any questions from him, voluntarily told him that "Mary Babey was to blame for all this trouble." The Mary Babey referred to was the wife of appellant's uncle. This statement was made by appellant to the officer before his removal from the place of the shooting and while his wife was still alive. After this statement was made to the officer he immediately conducted appellant to police headquarters, where in the presence of Col. Lindsey, chief of police, his person was searched and a letter, identified as in his handwriting, was removed from his pocket and read by Col. Lindsey. The letter was addressed to his mother and was as follows:

"Dear old mother—

I do hope that you will forgave me for doing this, for it is not my fault, Harry Thorpe and my wife have dog me for the last four years, and now they try and take my babies from me, and that is something that I cannot stand. Tell Mary Babey that if I never took my wife in her house this trouble would never have happened. She is the cause of it all. Well mother don't worry about me. Tell Scott to be good and take good care of you and my babies. Tell them all good-bye. Will mother I will say good-bye for the time.
"SON JULIUS."

The Harry Thorpe mentioned in the letter was the brother of appellant's wife, and as already stated, Mary Babey, also mentioned therein, the wife of appellant's uncle. According to the testimony of the officer making the arrest, appellant, when taken in charge by him, had a bottle of whiskey in his pocket and had been drinking intoxicants, but was not drunk, and his testimony in this particular is corroborated by that of Mrs. Thorpe, Shively, Evans and others then present.

The only issue of fact about which there was any diversity of opinion or contrariety of proof was as to the appellant's condition of mind at the time of the commission of the crime. The strongest evidence as to his alleged unsoundness of mind was furnished by the testimony of his mother, Mrs. Florence Babey, his sister, Mrs. Gertrude Smith, and the wife of his uncle, Mrs. Mary Babey. The mother testified that appellant when about twelve years of age received a blow upon his head from a brick, but how or by whom the blow was inflicted was not explained by her or anyone else. Her testimony bearing on the question of his condition of mind was as follows:

"Yes, when he was about twelve years of age he got a lick with a brick and we didn't pay much attention to it then, we didn't think it would hurt him; in about three days after that he had a high fever and we had to have the doctor for him about two weeks or maybe more, or I think it was about two weeks, something like that, and had his head bandaged, and ever since then the boy has not been right at all.

"Q. Just state to the jury in your own way what you have observed in reference to his mental condition? A. When I would go in his room to wake him he would jump and act like he was wild and I said to him, 'you just act like you are crazy, what in the world is the matter with you,' and he has carried on that way ever since. He has been often lying on a couch and look up to the ceiling and would act like he didn't know what he was doing. I really had to watch him half of the time, and I said to the family, 'I wonder what is the matter with that boy?' * * * Once when I went out in the kitchen he was sitting there eating and looked at me, and said, 'I will get you some day,' and I looked at him, I didn't know what he meant. I said 'What is the matter with you?' He said, 'Never mind, I am going to get you'—

jumped on us that way just for nothing; we didn't know what it was for; one evening there was a neighbor came along and was talking to me and he came in; he just looked like a lunatic; we could not get over it how he spoke to me and hopped on all of us; and I was in bed the next day from the way he went on to me and to her. Q. Was there any cause or provocation for him doing those things? A. None whatever. Q. What was his conduct with reference to his brothers? A. He would just get after them for nothing at all; we would be sitting there talking and the first thing you know he would be in a racket with them. Q. Did he have any cause or provocation to do those things? A. None whatever, he would just jump up and do that; we didn't know what was the matter with him, it would take us some time to get him quieted down. Q. What was his conduct towards his sisters? A. He didn't treat them very good either; he didn't like them very well, they didn't suit him half the time. Q. Did he have any reason or cause to be angry with his sisters? A. No, sir, they treated him very nice, the girls did. Q. How long have these peculiar actions on his part been noticeable? A. Since he was hit; since he was twelve years old he has not acted right, he has done queer things, he has not been right at all.''

On cross-examination the witness admitted that appellant worked and made his living all the time he lived with her family. When asked if she did not try, the preceding winter, to get appellant's wife to live with him, she answered: ''No, I asked her if she would make up with him; she said no, she wouldn't do it; and if she would write to him; she said no, she wouldn't go to the corner to get a postage stamp.'' Upon being further asked if she did not try to persuade the wife to go back to appellant and live with him, she answered: ''No, I did not, I don't think.'' She also admitted on the cross-examination that she had never attempted to have appellant confined in an asylum, his condition of mind investigated by a physician, or had a physician to attend him, except during the illness resulting from the blow on his head from the brick.

The testimony of the sister and aunt, though in large measure corroborative of that of the mother as to the condition of appellant's mind, was not so positive or specific in detail as was hers, that of the sister being to

the effect that while on a visit to her in Denver, Colorado, in 1911, he at times drank and when drinking would abuse her and act as if he was not right. In answer to the question, "What was there in his condition that led you to believe he was not right?" she answered, "From the way he would abuse me and after he would get tired he would sit and cry and the tears would roll down his cheeks on his trousers; he was so sorry after that, and I didn't think anybody was right that would act that way. * * * He came into my room one night and woke me and held the lamp over my face so close I could have knocked the lamp out of his hand; and commenced abusing me, wanted me to get up and get him something to eat, and I remarked to my sister and she made the remark also that something is wrong with Julius, he is not right. * * * Held the lamp until I went to get up and get him something to eat, and he commenced abusing me as soon as I got up to get something to eat for him; he talked and acted all right afterward; he even told it around that the farm was his and everything would be transacted through his hands; and the neighbors remarked that they didn't think he was right."

On another occasion and after appellant's marriage, the sister visited him and family in Louisville, and with respect to his conduct during that visit she was asked: "What was his conduct upon the occasion of your visiting at his home? A. During the time I was visiting at his home in December? Q. Yes? A. He went down—his wife told him to go down to get some coffee and he went down to Kieffer's grocery and took a drink; when he came back upstairs I noticed right away he was not feeling just right at the supper table; he abused me very much and I tried to talk to him and I saw the more I tried to talk to him the worse he was and I just left. Q. Did he have any cause or occasion to abuse you? A. None at all except drinking, I suppose. Q. What did he do the next morning? A. He sent his wife up—I think he put his wife on the car to call to apologize to me for what he said during the night; three or four times he wanted to get her to come up home and apologize to me because he had mistreated me."

On cross-examination the sister admitted that she had no knowledge of appellant's having received a blow on the head from a brick, although that event, according

to the testimony of the mother, occurred twelve years before the homicide, when the sister was eighteen years of age, before her marriage and while she was yet living with her parents.

The only thing testified to by the aunt in addition to what was stated by the mother and sister, was that appellant was absent-minded and would sometimes sit and talk and mumble to himself and appear to be disinclined to engage in conversation with others; that he was at times also despondent and would even cry. This witness, however, admitted on the cross-examination that she drove appellant out of her house on one occasion because of his abuse of his wife and his refusal to desist from such abuse when requested by her.

Of the other witnesses introduced as to the condition of the appellant's mind, Harry Lewis, clerk of the Archie Hotel, Louisville, testified that appellant registered at that hotel upon his return from Chicago before the homicide; that he was up at frequent intervals during the night and drinking heavily and had whiskey in his room; that he asked appellant in a joking way what was on his mind, to which the latter replied: "Nothing, but I can't rest; I just got in from Chicago; the trip was long and tiresome and I can't rest;" that the last time he saw him was about four o'clock on the morning of the homicide; appellant then had a fresh bottle of whiskey in his possession and the witness, at his request, took a drink with him from the bottle; that his talk was then disconnected and incoherent. On cross-examination the witness was asked: "You did not think he was crazy, did you? A. No, sir, I didn't think he was crazy. Q. You are not in the habit of drinking with crazy people at the hotel, or anything like that? A. I didn't think he was crazy because I took him to be more under the influence of liquor than anything else."

Another witness in appellant's behalf, Virgil Thomas, baggage master at the Louisville Hotel, testified that he had known appellant four or five years; that he saw him at the Louisville Hotel the afternoon before the shooting; that he was drinking at that time, his eyes were red and his face swollen. Witness gave appellant permission to go in the writing room of the hotel and write a letter, and afterwards he came out to where the witness was with a letter in his hand and asked witness to go to the bar and take a drink with

him, which he refused to do because he thought him intoxicated. Witness said he asked appellant why his eyes looked bad and what was the matter, also whether he had been on a drunk, to which the latter replied: "No, I came in from Chicago on the blind baggage and I got my eyes full of cinders." On cross-examination the witness was asked: "You didn't think he was crazy, did you?" To which he answered: "No, sir, not exactly." Following this statement the witness was asked by appellant's counsel on redirect examination: "Was he a boy that was peculiar in his actions?" To which he answered, "I have noticed him acting peculiar, yes, sir." Thereupon the Commonwealth's attorney asked the witness the following question: "You never saw anything in his conduct or actions that would lead you to believe that he didn't know the difference between right and wrong, did you?" To which the witness answered, "No, sir."

The witnesses James Duncan, Paul Jones and Scholard Baird, introduced for appellant, testified as to their presence at the jail following his incarceration, and as to the fact that he then seemed to be under the influence of intoxicants; that in the afternoon following his incarceration in jail he became ill and later fainted and was then given an emetic, followed by milk and egg, because of the opinion entertained by the jail authorities that he had taken poison. Appellant's remaining witnesses, Margaret Doyle, Alice Wagner, William Konz and Mrs. Harold Eoff, the latter being a resident of Chicago, at whose house appellant at one time boarded, testified as to his habit of at times drinking to excess, his moods of despondency or melancholia, and his absent-mindedness.

With the exception of the relatives of appellant mentioned, few if any of the witnesses introduced in his behalf expressed the opinion that he was of unsound mind; and none of the witnesses, unless it was the mother and sister, stated that his unsoundness of mind was such as to prevent him from distinguishing between right and wrong. The appellant himself testified in the case, but claimed to have had no recollection of anything that took place at the time of the homicide or during the morning hours preceding its occurrence. He, however, appeared to have a clear recollection of events occurring the day before and previously, extending back

to the time of his receiving at Chicago the letter advising him of the wife's suit against him for the divorce. He described the effect the contents of the letter had upon him, the worry that it gave him, the making up of his mind to return to Kentucky, the return on the train, and all that happened to him down to his arrival at the Archie Hotel, in Louisville, the night before the commission of the crime. He frankly admitted that upon receiving at Chicago the letter informing him of the institution of the divorce suit, he immediately began to drink intoxicants and that he drank heavily thereof down to his alleged loss of memory after reaching the Archie Hotel.

Mrs. Kate Thorpe, appellant's mother-in-law, and Frank A Webb, a friend of his of many years' standing, were introduced by the Commonwealth in rebuttal on the question of his condition of mind, and both testified that during their acquaintance with appellant they had never seen anything in his conduct or actions indicating that he was a person of unsound mind, and that they had never heard any intimation from his family or otherwise that he was of unsound mind. Mrs. Thorpe further testified that when in front of Mrs. Johnson's house and after appellant had there shot his wife, she said to him "You have killed Agnes;" that he thereupon looked at her and said, "Yes, I have killed her," and that in her opinion he then knew and realized what he had done.

Webb's testimony, so far as material to the question under consideration, is here given:

"Q. How long have you known the defendant? A. I don't know any estimated time, but I have known him a pretty good while, several years. * * * Q. What opportunity have you had to observe his actions and conduct? A. He lived in the front of the same house I did. Q. Did you ever see anything in his conduct to indicate that he was a lunatic or person of unsound mind? A. No, sir. Q. Did you think he was able to judge the difference between right and wrong? A. Yes, sir, when he is sober he does. Q. When he was drunk would he act like any other drunken person. A. He would come in and fuss. Q. He would fuss with —— A. His wife. Q. Did you see him fuss with anybody else particularly? A. No, sir, outside. Q. He would fuss with his wife when

he got drunk? A. When he got drunk. Q. Did you ever see anything wrong outside of that? A. No, sir."

No physician testified on the trial as to appellant's state of mind at the time of the homicide or that he was ever insane, nor does the record show any effort on the part of appellant or the Commonwealth to procure the attendance or evidence of medical experts. The evidence heard on the trial cannot be said to convincingly establish the defense of insanity. It does, however, show that appellant was a man of little force of character, intemperate in his habits and inefficient in providing for his family; that he was also possessed of a violent and ungovernable temper and when under the influence of intoxicants would abuse and otherwise mistreat his family and at times threaten and assault his wife. But it does not follow from these defects in the character of appellant, or because of his infirmity of temper, that he was insane at the time of killing his wife. To excuse the homicide on the ground of insanity the evidence must have been sufficient to establish the fact that appellant was without sufficient reason to know what he was doing or to know right from wrong, or that as the result of mental unsoundness he did not then have sufficient will power to govern his actions and was actuated by an insane impulse which he could not resist or control. We are unprepared to say that the evidence introduced in support of the appellant's defense of insanity was sufficient to overcome the legal presumption of his sanity required by the law, and the evidence introduced by the Commonwealth in support of that presumption. At any rate, the issue having been decided by the jury under proper instructions adversely to the appellant's contention, he must accept and we must approve the verdict of guilty, unless the alleged errors of the trial court complained of shall be found to compel a reversal of the judgment.

Appellant's first complaint is as to the ruling of the trial court in excluding from the consideration of the jury the following questions asked Mrs. Florence Babey and the answers it was avowed she would make thereto: "Q. Did you at any time have any conversation with his (appellant's) wife in reference to his mental condition?" To this question the avowal indicates the witness would have made the following answer: "That Agnes Babey, appellant's wife, stated to the witness

upon numerous occasions that the said defendant was insane and should be placed in a sanitarium; that his conduct and actions were such that no sane man would commit." "Q. I will ask you whether or not you advised your daughter at the time of the marriage that your son (appellant) was insane and that she had better not go and live with him?" To this question the avowal indicates that the witness would have made the following answer: "That she advised decedent, Agnes Babey, that Julius Babey was a boy of unsound mind and that she had better not co-habit with him because of this fact." In our opinion the foregoing questions and answers were incompetent, because the answers, if allowed as indicated, would have been only hearsay evidence. That such was its character is clearly demonstrated by the following rule announced in Chamberlayne's Modern Law of Evidence, vol. 4, sec. 2638:

"An extra-judicial statement may serve, as few other things can, to illustrate the condition of the mind of the speaker. Distinguishing, in the present connection, the actual force and power of the mind itself from proof of its contents, those mental states which are also seen to be established by the relevant utterance to which they give rise, it may fairly be said that the actual constitution of the mind is often appropriately so shown by these verbal manifestations, as in the case of declarations by a testator. In their assertive capacity, as proof of the facts which they declare, the unsworn statements are hearsay; and, in the absence of some special reason for receiving them, are to be rejected. As a general rule, narrative statements of past transactions which are without a circumstantially relevant quality are to be excluded.

"The only person whose extra-judicial statement indicating mental condition is regarded as admissible, because possessing an independently relevant or circumstantially probative quality, is the individual whose mental condition is in question. Coming from any other declarant the statement is to be rejected as hearsay. Not even the closest relationship, such as that of a father, wife, or other member of the family or the most confidential intercourse, e. g., that with a legal adviser, enables a person so circumstanced to make an effective unsworn statement regarding the mental condition of another."

It was obviously not competent for the witness to relate a conversation she had with the appellant's wife or any other person previous to the commission of the crime under investigation, for the purpose of showing what opinion she or the deceased or other person then had or declared as to the condition of the appellant's mind at that time. In other words, she could, as a witness testifying on the trial, after stating what her opinion as to the condition of his mind was at the time the crime was committed, also say as to what opinion she entertained as to the condition of his mind prior thereto, but it was not competent for her to state that she had prior to the commission of the crime or to the trial expressed her opinion to another or obtained from such other an expression of opinion, as to the condition of his mind.

The complaint of misconduct on the part of the Commonwealth's attorney arises out of the following statements made by him in closing the argument to the jury:

"Gentlemen, I was not surprised at the plea in this case, because the criminal records of this State and the criminal records of all the states in this great Union show that it is in cases of this character, in cases of particularly horrible character, when there is no other refuge, when there is no other salvation, the guilty and red-handed criminal seeks the defense of emotional insanity * * * and the records of our courts show, and I say it with shame and with sorrow, that too often juries have been willing to accept the miserable pretense of emotional insanity and thereby free the red-handed criminal from the consequence of his horrible deeds."

In making the statement referred to, the Commonwealth's attorney mentioned a condition generally known to exist in this State and elsewhere. Undoubtedly in criminal cases, insanity is a much abused defense, because so often resorted to when no other excuse can be shown for the crime. The reference made to its abuse was a legitimate deduction from the evidence and but stated a condition shown by the records of the court, constantly discussed in the newspapers and other publications of the day, and, therefore, as well known to the jury historically as any other fact of which they, in common with all other citizens of the State, had knowledge. The statement was closely akin to one

made to the jury by counsel, mentioned in Austin v. Commonwealth, 124 Ky. 55, "that the crack of the pistol, the roar of the shotgun and the flash of the dirk have made the State notorious for crime." With respect to this statement it is in the opinion said:

"The attorney was evidently warning the jury of their duty as part of the machinery of the law for the punishment of crime, that personal violence resulting in innumerable deplorable tragedies, the history of which was well known, was due to the lax administration of the law, and that all such could best be deterred by a prompt and stern enforcement of the law against homicide in each case by the jury trying it. We do not think the line of argument was objectionable."

Again, in Houssman v. Commonwealth, 128 Ky. 818, it is said:

"Much latitude is of necessity allowed an attorney in the presentation of his case, the only limitations being such as require him to confine himself to the facts introduced in evidence, and the fair and reasonable deductions and conclusions to be drawn therefrom, and the application of the law, as given by the court, to the facts proven. Controlled, regulated, and bounded alone by these limitations an advocate may, with perfect propriety, appeal to the jury with all of the power, force, and persuasiveness which his learning, skill, and experience enable him to command; and of this character of argument the accused may not complain, even though he feels that his conviction may be traceable more directly to the argument of counsel than to the facts proven." Oldham v. Commonwealth, 136 Ky. 789; Lee v. Commonwealth, 142 Ky. 742; Ball v. Commonwealth, 27 R. 448; Sturgeon v. Commonwealth, 31 R. 536.

The complaint made by appellant of the instructions is without merit. By them the jury were correctly told in what state of case they would be authorized to find the appellant guilty of murder, voluntary manslaughter, involuntary manslaughter, and what punishment appertained to each; also what would authorize a verdict of acquittal for accidental killing or on the ground of insanity or self-defense, while in and through them separately and as a whole ran the admonition to the jury to allow appellant the benefit of every reasonable doubt in the matter of determining his guilt or innocence, or, if they found him guilty, in determining the degree of his

offense. The principal criticism of the instructions is that those as to voluntary, involuntary manslaughter and accidental killing, were unauthorized by the evidence and therefore calculated to confuse and mislead the jury. The instructions complained of were given by the court upon the theory that they were necessary because appellant twice shot his wife in a bedroom at the residence of her mother, Mrs. Thorpe, to which shooting there was no eye-witness, and that although the wife was again shot by him in front of the residence of Mrs. Johnson and there died, it was not the province of the court to instruct the jury, as a matter of law, that the third shot, in front of the Johnson residence, and not one of those inflicted in the house of Mrs. Thorpe, caused the wife's death. So it was left to the jury to determine whether the fatal wound was inflicted by appellant in the Thorpe house or in front of the Johnson residence, and as it was the opinion of the trial court that if they found that the fatal shot was fired at the Thorpe residence, to which there was no eye-witness, under the rule announced in Rutherford v. Commonwealth, 13 Bush 608, and numerous other cases decided in this jurisdiction, they should be advised by the instructions as to the law of voluntary manslaughter, involuntary manslaughter, accidental killing and self-defense, the instructions in question were given. But as it is evident that the jury were satisfied from the evidence that the shot fired in front of the Johnson residence caused the death of the deceased, and for that reason found appellant guilty of murder under the first instruction given by the court, they could not have been confused or mislead by the instructions in question, hence they were not prejudicial to the appellant.

The newly discovered evidence on account of which the new trial was sought is furnished by the affidavits of several alienists, some of whom are eminent in their profession, to the effect that they made an examination of the appellant after the trial and were satisfied that he is suffering from a mental disease known as a "paranoid" form of "dementia praecox," a form of insanity that is progressive, incurable and finally fatal, which might have been caused in his case by a blow on the head in childhood, contributed to by his habit of intoxication, but was more probably due to inherited taint transmitted by the father through a venereal disease

with which the latter is said to have been afflicted before
the birth of appellant; that one affected as was appel-
lant, is possessed of an insane desire to kill and is un-
able to appreciate the nature and consequences of his
action or know the difference between right and wrong.
The only evidence of the father's having been afflicted
with the venereal disease is furnished by the affidavit of
his brother, an uncle of appellant, which, besides being
indefinite and unsatisfactory in other respects, does not
mention the name of the physician who treated the
father for the venereal disease, the character of the
treatment given or the duration of the disease. The only
reason offered by the affiant for his inexcusable failure
to testify on the trial of appellant as to the disease of
the father, was that family pride made him reluctant
to do so. The affidavits of the physicians mentioned
are based upon purely speculative and theoretical ideas
of a condition supposed to exist several months before
the affidavits were made; and while the affiants, or most
of them, expressed the opinion that appellant must have
been the victim of a mental disease with which he was af-
flicted for quite a period of time, none of them pretends
to state what his condition of mind actually was at the
time of the homicide. If, as stated by them, the disease
is a progressive one, the fact that they were positive
of the insanity of the appellant at the time of his ex-
amination by no means establishes the fact that such
was his condition at the time of the homicide. In other
words, there is much truth in the following statement
made by the trial court in overruling the motion for a
new trial: "It does not appear from any of these affi-
davits that the accused's mind might not have been act-
ing perfectly rational at the time of the homicide, and
all the evidence introduced tends very strongly to show
that it was. * * * Even with all the evidence furnished
by these affidavits before the jury, it would have been
wholly unwarranted in finding appellant insane at the
time of the killing."

It is also to be remarked that the evidence furnished
by these affidavits is an entire departure from that in-
troduced on the trial to establish the appellant's in-
sanity, which fact puts the appellant and such of his
family as aided in his defense in the reprehensible at-
titude of having experimented with the court and with
justice, and would, if a new trial were granted, permit

them to renew his defense upon a ground practically independent of that relied on in the trial. It appears from the record that appellant was given ample opportunity to prepare for the trial. Indeed, he asked for no further time when the case was called for trial, and the suggestion as to his poverty having prevented him from getting the benefit of the newly discovered evidence on the trial, can have little weight in view of there having been no effort by him or in his behalf to see the physicians whose affidavits he procured, before his trial and ascertain from them what they would have testified if summoned as witnesses in his behalf. It is by no means certain that the newly discovered evidence would have a preponderating or controlling effect upon the minds of the jury if another trial should be had. If new trials are to be granted in order that new theories of defense urged by the accused may be tried out, there will be no end to prosecutions, to say nothing of the inducement that such a practice would hold out to the accused and his relatives and friends to withhold valuable evidence and in case of conviction attempt to obtain a new trial in order that he might obtain the benefit of such evidence and secure another chance of escape before a jury. No diligence whatever was used to obtain for the appellant the evidence of the newly discovered witnesses. If, as intimated by counsel, appellant's condition of mind has grown so much worse since the trial as to demonstrate his insanity, the Code provides a way by which that matter may yet be inquired into.

As on the whole case we find no error that can be said to have prejudiced the substantial rights of the appellant, and are convinced that he had a fair and impartial trial, though the punishment thereby resulting to him will be the severest known to the law, it is our painful yet imperative duty to allow it to be executed. Wherefore the judgment is affirmed. Whole court sitting.