### Simmons v. Commonwealth.

(Decided October 17, 1924. Rehearnig denied, with modification, March 20, 1925.)

### Appeal from Barren Circuit Court.

1. Homicide—Evidence that Accused Shot and Killed Deceased Held Sufficient to go to Jury.—Evidence that accused shot and killed deceased held sufficient to go to jury.

2. Homicide—Accused's Admission that he Killed Deceased Required Justification or Excuse.—Accused's admission that he killed deceased required that he justify or excuse his act by evidence.

3. Homicide—Any Evidence of Accused's Guilt, However Slight, Requires Submission to Jury.—Where there is any evidence, however slight, tending to show accused's guilt, case should go to jury.

4. Criminal Law—Jury Judge of Facts and Credibility of Witnesses. —Jury is judge of facts and credibility of witnesses, and may attach such weight to testimony as it deems proper.

5. Criminal Law—Accused's Failure to Insist on and to Obtain Ruling on Objection Waives Objection.—Where accused desires to object to question asked by Commonwealth, he should do so, and failure to insist on and to obtain ruling waives objection.

6. Criminal Law—On Appeal Court Cannot Review Trial Court's Rulings if Exception Thereto Not Reserved.—If court refuses to rule on accused's objection, or if ruling is adverse, accused should reserve exception otherwise error is not reviewable on appeal.

7. Criminal Law—Evidence Admitted Without Objection Given Probative Weight to which it is Entitled.—Parties may object to admission of testimony as they see fit, and testimony admitted without objection is to be given that probative force to which it may be entitled.

8. Criminal Law—Party should Move to Strike Out Objectionable Answer to Question, and Not Merely Note Objection Thereto.— Where answer to unobjectionable question is objectionable, party to whom it is objectionable should move to strike it out in whole or in part, and reserve exception to adverse ruling; mere noting of objection after answer not being sufficient.

9. Criminal Law—Argument of Commonwealth's Attorney Supported by Incomptent Evidence Admitted Without Objection Held Unobjectionable.—Argument of Commonwealth's attorney in prosecution for murder, that accused had young men running back and forth to his house day and night, and that he was ruining young men, was not objectionable where it was supported by evidence, which though incompetent was admitted without objection.

10. Homicide—Ruling Sustaining Commonwealth's Objection to Question Why Deceased Wanted to Kill Accused Held Properly Sustained.—Ruling sustaining Commonwealth's objection to question why deceased wanted to kill accused must be sustained where accused's avowal as to deceased's threats against him did not name persons who communicated threats to him, and he had previously testified thereon in his direct examination.

11. Criminal Law—Accused's Objection that he was Indicted for Murder, Tried for Bootlegging, and Convicted of Manslaughter Held Not Sustained.—Accused's objection that he was indicted for murder, tried for bootlegging, and convicted of manslaughter could not be sustained, where in many instances he failed to object to evidence, and when he did object failed to reserve exceptions to adverse rulings.

12. Criminal Law—Accused's Attorney could Not Object that Commonwealth's Attorney Used 20 Minutes in Presenting Case to Jury.—Where Commonwealth's attorney asked for 20 minutes to present case to jury, accused's attorney who asked for 10 minutes, but used only seven, could not object that Commonwealth was allowed longer time than he required.

J. R. WHITE, WHITE & SMITH, W. E. JONES and RODES & HARLAN for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

The appellant, charged with the murder of Clarence Dugard, was convicted of manslaughter and his punishment fixed at five years' confinement in the penitentiary.

Appellant is a young man about 28 years of age, and has been married nine or ten years. He and his wife and one child lived about one and one-half miles from Glasgow, in Barren county, near the village of Jacksonville. On December 8, 1923, appellant killed Clarence Dugard. Dugard had been living in appellant's home off and on for about a year and a half before the tragedy. From what we can gather from the evidence, our conclusion is that whenever he was not in jail for bootlegging, he was to be found in the Simmons home. It seems that after Dugard left his father's home he took up with Simmons. He was about eighteen years old when he was killed.

There also lived in this Simmons home a Mrs. Jolly, who assisted Mrs. Simmons in doing the housework. About six or seven weeks before the tragedy, Mrs. Jolly informed Simmons of an improper intimacy existing between Mrs. Simmons and the dead man. Simmons told Dugard what he had learned, and told him that he didn't want him on or about his place any more, and Dugard left, going to Larue county, where he stayed until shortly before he was killed. On the night before Dugard was shot, Simmons, in company with Hobart Bryant, had gone to Tompkinsville, but for some reason they returned that night, and when they got back to the house, about one o'clock, Simmons entered the house, and found Dugard in bed with Mrs. Simmons. Dugard ran away in his sock feet. Simmons told his wife he was going to take her back to her mother, but she was in an intoxicated condition, and declined to go. Simmons got in his car and drove to the home of his mother-in-law, and brought her back with him. He then took his child, his wife and her mother to the latter's home. He then went back home and undertook to sleep, but said that he was unable to do so. He had slaughtered a hog the day before, and on the morning of the 8th he took this hog to his mother-in-law.

After fleeing from the Simmons home in the early morning of December 8th, Dugard spent the remainder of the night in a neighboring barn, and was next morning driven to Glasgow by Leland Baker, and said to Baker: "I have played the devil." He said that Buford had run in on him at home the night before and Dugard said: "I am going back to town and if he says anything to me, I am going to do away with him." After getting a new pair of shoes and having his clothes cleaned and pressed, he went to Mrs. Austin's and saw Mrs. Simmons there.

What passed between them we cannot know. Death has closed Dugard's mouth, and section 606 of the Code closes hers. Next Dugard cleaned and oiled his pistol. After oiling his pistol, Dugard employed Joe Conklin, a taxi driver, to drive him out to Buford Simmons' home. Dugard didn't go directly to the Simmons house, but stopped at what the witness described as "A little house there by the side of Buford's." He drew his pistol and fired it some eight or ten times, then reloaded it and went to the Simmons home. The witness entered the Simmons home with Dugard. Simmons was there. They sat down and talked a while, then Conkin drove back to town. Dugard asked Simmons if he was mad, and Simmons said: "I don't care to talk about it."

About that time Charley Wilson came and said that he wanted to go to Glasgow. Simmons got Dugard to consent to go to Glasgow with him. According to the witness Wilson, Simmons made several efforts in Glasgow to get Dugard to get out of the car, but he declined to do so. Simmons remarked to Dugard: "You are drinking and I don't want you any further in my home, and you will please get out and leave and get away from me." Wilson got out, and Simmons and Dugard went back to Simmons' house. When they got to the Simmons home, according to Simmons and the witness Ray Austin, they both got out of the car and Dugard entered the home, then came out and began shooting at Simmons. Dugard fired three times; then Simmons fired three times. Dugard fell. Simmons and Ray Austin came to Glasgow. Simmons surrendered to the sheriff and delivered his pistol to him. It was examined and it was found that three shells had been fired. The sheriff, the jailer and several others went to the Simmons home. They found Dugard something like six or eight feet from the house. He was lying on his back, and, according to witnesses, had apparently fallen on his back, and had rolled over to the right a little. He was dead. His pistol was lying near his right hand, and, according to the testimony, "It looked just about like it had eased out of his hand." This pistol was examined and it was found to have been freshly oiled, and three shells were empty. Dugard was shot once in the breast, once to the right of the navel and once to the left of the navel. All three shots entered from the front, went entirely through his body and came out the back. The shirt which Dugard had on was ex-

hibited to the jury, and the front of it was stained from the shot in the breast.

Jack Davis, the constable, was introduced and by him it was shown that Dugard had the reputation of being a violent, dangerous man when under the influence of liquor.

Pate Walkup, the town marshal of Glasgow, showed by his evidence that Dugard had the reputation of being fussy when he was drinking, and that when he was in that state he was not afraid of anything. It was shown by this witness that Dugard had had one or two difficulties that the witness knew of, and he had heard people speak of him as a dangerous man. It was further shown by Walkup that he had shot pistols frequently and had had experience with discharging pistols, and with the powder burns which resulted from pistol shots, and that a pistol would burn a 'man's shirt five or six steps away.

It was shown by the witness Paul Turner that he had driven Dugard to Simmons' home about a week or so before the shooting and that Dugard got out and told the witness to remain in the car until he came back. According to the witness: "He said he was going in to get him some, and told me to keep my seat, that he would be back in a minute." When Dugard came back the witness told him that Simmons would find this out some time and kill him, and Dugard remarked that he didn't give a damn, as he was going to kill him.

By the witness, Clifton Page, it was shown that Dugard had told him and had told Mrs. Jolly that he was going to kill Budford Simmons. This threat was communicated to Simmons some time before the killing.

The evidence of Hobart Bryant was that he, in company with Buford Simmons, had been to Tompkinsville and they came back together, and went to Simmons' house on Saturday morning at one o'clock, before the killing on the same day, and that the defendant went in the house and caught the decedent, Dugard, in bed with defendant's wife, and that Dugard immediately jumped up and ran out of the house in his sock feet, and left his shoes; that some time before the killing he heard the decedent say in his presence when no one else was present, that he expected some time to have to kill Buford Simmons, or to get killed, because of the relationship between him, Dugard, and Simmons' wife, and that he, Hobart Bryant, informed defendant of the threats before the killing.

It was shown by the witness, W. H. Church, that he was at work at his home about a quarter or half mile from Simmons' home the day the shooting occurred; that he heard the shots; that after the first three shots were fired he saw some man apparently going from the house to the road; that he went a step or two and then turned back; that he was unable to tell who the man was or whether he was white or black, and he heard two more shots. He was asked if this man would have time to go inside the house after he saw him, and before the last shots, and he said that he didn't think he would have time to do so. He said there were trees that cut off his view, but he said he saw a man going back to the house after the shooting was over.

The jailer, Mansfield, said, when asked about what he saw at the Simmons home shortly after the killing: "We thought we saw a bullet hole. It was some kind of a little hole, and we thought it was a bullet hole in the ground." The witness, Ed. Matthews, said that he saw two holes in the ground, and one through the wall of the house; that these two holes in the ground appeared to be six or eight feet from the body of Dugard.

At the conclusion of all the evidence the appellant moved the court to instruct the jury peremptorily to find him not guilty. The court refused to give this instruction. The defense excepted.

It was evidently the theory of the Commonwealth that after returning from Glasgow with Dugard, Simmons had shot him and had then started to his car, but bethought himself of the necessity of preparing some defense, whereupon he returned, got Dugard's pistol, fired it into the ground and then left it beside his body, and that this man whom the witness Church saw flee from the house and then return to it was Simmons.

The Commonwealth had proved that Dugard was dead, and that Simmons had admitted killing him by shooting him with a pistol. With these facts established, it could not be said that there was no evidence of the guilt of Simmons. Simmons' admission that he killed Dugard made it incumbent upon him to justify or excuse his act by evidence. Culpepper v. State, 4 Okla. Cr. 103, 111 Pac. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668. Where there is any evidence, however slight, tending to show guilt of the accused, the case should go to the jury. Spicer v. Com., 199 Ky. 658, 251 S. W. 853; Belcher v. Com., 181 Ky. 516, 205 S. W. 567; Ratliff v.

Com., 182 Ky. 246, 206 S. W. 497; Levering v. Com., 132 Ky. 666, 117 S. W. 253, 136 Am. St. R. 192, 19 Ann. Cas. 140. The jury had before it the clothing worn by Dugard when he was killed. That clothing, with the stains on it and the holes in it, together with the evidence of the supposed bullet holes in the ground, and the evidence of Mr. Church, may have enabled them to arrive at their verdict. Dugard was shot three times, but the record before us shows his shirt was powder stained only once. That is strange. One thing is certain, the clothing could not lie. The relation between Dugard and Mrs. Simmons was perhaps regarded by the jury as a motive for the killing. Juries are the judges of the facts and the credibility of the witnesses, and may attach such weight to the testimony of any of them as it deems proper. That they did so as to the evidence of the appellant and Ray Austin is apparent, but that they had the right to do so is beyond question. In his closing argument, the attorney for the Commonwealth said:

"Gentlemen of the jury, you should convict Buford Simmons; he took this young man, Dugard, and then sent his soul to eternity.

"Gentlemen of the jury, the Commonwealth has no eye-witness to this killing, but you can disregard the evidence offered by the defendant, and read between the lines, and use your own judgment and not let them fool you; you do not have to be made fools of; use your own judgment and arrive at a verdict in this case.

"Gentlemen of the jury, this young man, Simmons, was running his car after night; he went to Tompkinsville the night before the killing, started after dark and came back before daylight. He had young men running back and forth to his house day and night and there was something going on and on that account he *made* his wife away. He was ruining the young men of this community."

The appellant objected to these remarks and moved the court to admonish the jury to disregard them, but the court declined to do so, to which the appellant excepted. This court has said:

"Much latitude is of necessity allowed an attorney in the presentation of his case; the only limitations being such as require him to confine himself to

the facts introduced in evidence, and the fair and reasonable deductions and conclusions to be drawn therefrom, and the application of the law, as given by the court, to the facts proven. Controlled, regulated, and bounded alone by these limitations, an advocate may with perfect propriety, appeal to the jury with all of the power, force, and persuasiveness which his learning, skill and experience enable him to command; and of this character of argument the accused may not complain, even though he feels that his conviction may be traceable more directly to the argument of counsel than to the facts proven." Babey v. Com., 169 Ky. 735, 185 S. W. 81.

From this it is apparent that this argument is not objectionable if it is warranted by the evidence, so that the question of the correctness of the court's ruling upon the appellant's objection to this argument carries us back to the evidence to which we must look to see if such argument was justified, and when we examine the evidence, we find there was evidence to support all that the attorney for the Commonwealth said, and he was fully warranted in making the argument he did. It is insisted that this was based on evidence that was incompetent. The appellant allowed it to be introduced without procuring a ruling thereon, often without making any objection thereto; and on the nine occasions in the introduction of the evidence when the appellant did object, there is often nothing in the record to show whether the court sustained or overruled the objection, and but once does an exception appear to have been taken. When a question is asked by the Commonwealth, if the defendant desires to object to it, he should do so, and should insist that the court rule upon the objection. If no ruling is obtained, then the objection is waived. Skidmore v. Harris, 157 Ky. 756, 164 S. W. 98. If the court does not then rule on the objections or the court's ruling should be adverse to the defendant, the defendant should reserve an exception. Unless that is done, the error is not reviewable in this court. See Branson v. Com., 92 Ky. 330, 17 S. W. 1019; Traughber v. Com., 198 Ky. 596, 249 S. W. 770; Elmore v. Com., 201 Ky. 427, 257 S. W. 32. Parties have the right to object or not, as they may see fit, to the admission of testimony that may be offered during the progress of a trial, and if they fail to do so, the testimony is to be weighed by the court or jury, and given that probative force to which it may be entitled.

When a question is asked and the question itself is not objectionable, but the answer that is made thereto is objectionable, then the party to whom the answer is objectionable should move the court to strike either the whole, or that part of the answer to which he objects, and when the court rules on his motion adversely, exception should be noted. Thus, when the Commonwealth asked the witness Jack Davis about the defendant's general reputation, and Davis answered. "He is a bootlegger," the defendant should have moved to strike out the answer and after the court ruled on that motion, should have reserved exception to the ruling, if adverse. It was not sufficient to merely note an objection after the answer was made.

The defendant was asked on his re-direct examination why it was that Dugard wanted to kill him. He started to answer; the Commonwealth objected; the court sustained the objection, and for once, defendant reserved an exception. Thereupon the following avowal was made: "That the witness, if permitted to answer, would state that he had been told by five different witnesses that Clarence Dugard and his (Simmons') wife had agreed to kill him to get rid of him, so that his wife could collect twenty-five hundred dollars of insurance." This ruling of the court may be sustained for two reasons. First, because the defendant did not offer in his avowal to give the names of the parties who had communicated the threat to him, and second, because the matter had been gone over in chief. In the early part of his direct examination he testified that he had received such information from Mary Jolly, Warren Tom Tobin, Emma Buster, Hobart Bryant and Clifton Page, of whom the first three were not introduced, but the evidence of the other two is on the record, and we have noted above what they said.

Appellant insists that he was indicted for murder, tried for bootlegging and convicted of manslaughter; but a complete answer to this is that if that was done, it was his fault, as in many instances he did not object to the evidence when offered, and in those instances that he did object, no exceptions were reserved to the ruling of the court. When the court instructed the jury, he reserved no exceptions to the instructions given.

At the conclusion of the evidence, the Commonwealth's attorney asked for twenty minutes to present

the case to the jury; counsel for defendant was asked how much time they wanted, and the reply was "ten minutes," of which defendant's counsel only consumed about seven minutes, and he now complains because the court declined to limit the attorney for the Commonwealth to the same time; but, since he had all the time he wanted and more, he should not object to the attorney for the Commonwealth taking such reasonable time as he wanted for his argument. He does not contend that he desired to argue the case any longer, but objects because the Commonwealth did. If he had desired to make an argument of equal length with the argument made by the attorney for the Commonwealth, then he should have asked for twenty minutes. Having failed to do so, he cannot complain now.

It is evident that the jury believed neither the defendant nor his witness Austin, else he would not have been convicted; and if he and his witnesses have so conducted themselves that a jury of their county will not believe them, that is the defendant's misfortune.

There was evidence sufficient to support the verdict, and the judgment is affirmed.