## Hacker v. Commonwealth.

(Decided April 19, 1935.)

H. C. JOHNSON and S. M. WARD for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

On September 15, 1932, Amerida Hacker and his son Jim were jointly indicted by the grand jury of Perry county, charged with the murder of Lizzie Gilbert Hacker, wife of appellant and stepmother of the

boy. The boy has been discharged by a verdict rendered pursuant to peremptory instruction. Appellant was found guilty, and his punishment fixed at confinement in the penitentiary for life, and he appeals.

When the case was called for trial on September 23, 1932, appellant filed a motion supported by affidavits, seeking to have the court inquire into his condition of mind, which motion was granted, and, upon inquirendo appellant was found to be of unsound mind and was committed to the Hospital for the Insane at Lexington, Ky. We gather from the record that he remained at that institution for 8 or 9 months, when he was discharged.

On May 16, 1934, the appellant was brought to trial, with the result that after a hearing, the jury returned a verdict as above indicated, whereupon in due time appellant filed his motion for a new trial supported by five grounds, three of which are earnestly relied on here for a reversal upon the appeal granted by the lower court: (1) It is claimed that the court below committed prejudicial error in admitting evidence relating to alleged dying declarations, which it is contended took too wide a range, and should have been limited to a recital of the acts immediately attending the shooting of Mrs. Hacker; (2) that the verdict was not supported by the evidence; and (3) that the attorney for the commonwealth in the closing argument was guilty of such misconduct as prejudiced the rights of appellant.

The complaints are discussed in appellant's brief in the order given, but in disposing of the case we prefer to take them up in a different order, first giving attention to complaint No. 2, since discussion of that point will aid in arriving at a conclusion as to other alleged errors.

Appellant, a man about 70 years of age, had been married twice before his marriage to the deceased, to whom he was married about 10 years prior to the day of the homicide, and they had been separated for 4 or 5 months. Appellant had lived with his sons and deceased had lived with her people. He had children by his first and second wives, and deceased had children by a former marriage. On July 19, 1932, Edna Gilbert, daughter of deceased, and Virginia Hacker, daughter of

appellant, drove over from Dayton, Ohio, apparently for the purpose of taking Edna's mother back with them. They spent the night with Nash Gilbert, and, after dinner the next day, July 20, they were making preparations to start on their journey to Dayton. Appellant and his son Jimmie rode up to the Gilbert home; Jimmie remained outside, and deceased came into the house and apparently greeted everybody pleasantly. Mrs. Hacker was lying down at the foot of a bed, and, after the exchange of greetings, appellant said to his wife that he wanted to talk to her, and, after saying that she did not want to talk with him, they went into the kitchen, where they had a conversation about the trip to Dayton; appellant expressing desire to be taken along with those who were to make the trip. The conversation was interrupted by appellant's stepdaughter, and appellant suggested that his wife accompany him outside, where they could talk alone. About this time the persons leaving for Dayton were loading their baggage and preparing to start on the trip. From this point on the testimony is confusing, but it is gleaned from the testimony of several eyewitnesses that the party was gathered around the automobile, when appellant went to his son Jimmie who was sitting on his mule, and, after a slight remonstrance on Jimmie's part, obtained a pair of saddle pockets and started up the road. He was insisting that his wife come up the road for a conversation, and she finally consented. Two of the children went along; one of his daughters being near to appellant, and one of her daughters accompanying deceased. They had not gone a great distance, certainly not out of sight of those who remained near the automobile, when appellant attempted to fire his pistol at Mrs. Hacker. Due to the fact that his daughter grabbed his arm, the shot went wild, but appellant threw her away from him and fired again. Mrs. Hacker, struck by the second shot, turned and fell to her hands and knees, and appellant fired two more shots, the latter going into her back and penetrating her body. The first shot went through the upper part of her right hip. Mrs. Hacker died the following day, making declarations that will be referred to later.

On the trial appellant did not testify nor did he offer any evidence as to details of the shooting. His sole defense was that of insanity; such proof as was offered for the defense relating alone to appellant's

mental condition. It naturally follows the complaint that the verdict of the jury was not supported by the evidence must be based on the idea that it showed appellant to have been of unsound mind. This complaint might well be disposed of by the statement that, upon the proof adduced, the question was submitted to the jury under an appropriate instruction. However, since the penalty inflicted was a severe one, we have taken the trouble to analyze the defense proof.

The record shows that when the case was first called, an inquirendo proceeding was had, resulting in a finding by the jury that Hacker was of unsound mind, and he was committed to the Eastern State Hospital, where he remained for 8 or 9 months and was discharged. The record does not contain the evidence adduced on that trial; nothing further than the petition and the judgment of the court. Most of the evidence introduced on the trial related to appellant's actions and appearance after he was discharged from the hospital and after he was taken by the officers for the purpose of his trial. Three doctors testified; two of them had testified on the inquirendo; and one of them noted a material change for the better in his condition up to the time of the trial. The other doctor, who had formerly testified, declared on the trial that Hacker was now sane. The third doctor gave his opinion, based on an acquaintance of long standing. He was the only doctor who undertook in any way to throw any light on the mental condition of Hacker prior and up to July 20, 1932, and the most he would say was that from his observation (evidently casual and nonprofessional) Hacker was not a normal man; that "he was different in many respects from along about 1898 to 99, up to all the time I observed him, to what he was before that time." On cross-examination he said that Hacker was a man of ordinary intelligence. No other witnesses were introduced to show appellant's mental condition on or before July 20, 1932, except his sons Jimmie and Luther. Jimmie testified that after the separation of appellant and his wife he would not work, that "he was different in his talk and always seemed to be weak and nervous; he wouldn't eat very much or wouldn't rest much at night; would say he was going one place, and I would notice he would go in another direction; seems like he wasn't satisfied any place." When questioned

about his previous condition, Luther said appellant was worrying about his wife; he wanted her to come back home.

It is hardly necessary to relate the testimony of the officers who took charge of him and brought him in for trial, since their testimony related to his actions and appearance at that time, which was long after his discharge from the hospital, and quite a long time after the homicide.

Viewing the evidence which related to the state of mind of appellant as of the date of the homicide, prior thereto and at the time of the trial, the court is compelled to say that it is far from convincing; it does not measure up to that degree of satisfactory testimony as would here even create a doubt that the jury was fully justified in concluding that he was sane on July 20, 1932, and at the time of the trial.

Taking up the first ground pressed by counsel for appellant, which related to the alleged dying declaration, it appears that one of the deceased's daughters, who was with her before her death, testified to a certain statement made. It is not argued that the statement was not made in extremis, but it is insisted that a portion of the statement was incompetent and prejudicial. After stating that she was going to die, deceased said in response to a question, ''Well honey, he took my money that my dead boy left me.'' She also stated that ''he'' (referring to appellant) ''sent her boy back to prison for nothing. He killed me and I want him punished.''

It appears from the record that the court sustained objections of defendant to the portions of the alleged dying declaration which related to the taking of the son's money and sending the boy back to prison, but, if this were not true, the court could not now say the evidence was prejudicial, because of the fact that according to the proof there was no doubt as to the identity of the person doing the shooting nor was there any lack of details as to facts and circumstances leading up to and attending the homicide.

Other testimony objected to related to a detailing by the daughter as to a pension received by her mother, which she says the mother used in maintaining herself and husband. Counsel for appellant treats this evi-

dence as if it were a part of the dying declaration, but we do not so view it. It was testimony of existing facts, of which the witness exhibited direct knowledge, and, while it may be said that it was to some extent irrelevant, it was not of such character as would be calculated to prejudice the rights of appellant, particularly so since his entire defense was based on the claim of an unsound mental condition.

The third and last contention is that the commonwealth attorney was guilty of misconduct in the use of certain language in his argument to the jury. On the trial he asked one of defendant's witnesses if he did not know that appellant, about 15 or 20 years ago, had killed a man and afterwards acted crazy. The witness denied that he had ever heard of such an incident. The question was then asked if appellant had not been accused of a killing and made the defense of insanity. The court sustained an objection and admonished the jury, though the witness did not make reply to the question. In the argument to the jury, the attorney for the commonwealth said: "I don't know whether he has ever played off crazy as his defense before or not, and I don't know whether he has ever killed anybody else or not."

This statement was objected to and the objection overruled, and appellant insists that by this statement the inference was carried to the jury that appellant had theretofore killed some one else and had presented the defense of unsoundness of mind. This statement might have been left unsaid, but we cannot see wherein it could be classed as a statement such as would be calculated to bias the jury in its consideration of the question before it. This court has had before it many cases in which similar statements have been made over the objection of the person on trial, and, while there is no fixed rule by which such statements and their possible or probable effect may be measured, many cases hold that there must be some latitude allowed an attorney in presenting the commonwealth's side of the case. Allen v. Com., 175 Ky. 46, 193 S. W. 650; Meredith v. Com., 148 Ky. 106, 146 S. W. 407.

It is apparent from the record that the attorney was not attempting to state a fact or to indicate to the jury that he had knowledge of any such facts as might have been suggested by the questions propounded, and

it may be that he was conveying to the jury the idea that, notwithstanding the question, he had no knowledge of the existence of such facts.

We have compared the statements made in this case with the language used by the attorney in Babey v. Com., 169 Ky. 735, 185 S. W. 81, which was a case of homicide with the defense of insanity, and in which case language much more calculated to inflame the minds of the jury was indulged in, and in which the court held no error.

Having in mind that the defense here was solely one of insanity, which defense the jury under proper instruction rejected, and that the proof of the homicide was clear, we are of the opinion that no error prejudicial to the substantial rights of appellant was committed.

On the whole case, as we view the record, we can express no other opinion but that appellant has had a fair and impartial trial.

Judgment affirmed.