## Terhune v. Commonwealth.

(Decided October 27, 1922.)

### Appeal from Mercer Circuit Court.

1. Criminal Law—Directing Verdict.—A court is not authorized to direct a verdict of acquittal where there is any evidence of guilt.

2. Criminal Law—Setting Aside Verdict.—A verdict may be made upon circumstantial evidence as well as from direct evidence by eye witnesses, and a verdict will not be set aside, upon the ground, that the evidence is insufficient to support the verdict, unless it is flagrantly and palpably against the evidence.

E. H. GAITHER for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HURT— Affirming.

Ralph Terhune, a boy about 18 years of age, was indicted for a violation of section 1201c, Kentucky Statutes. Upon a trial the jury found him to be guilty of stealing fowls of less value than two dollars, and therefore he was adjudged guilty of petty larceny. A new

trial being refused, he has appealed and seeks a reversal of the judgment upon the grounds that the court erred to the prejudice of his substantial rights, (1) in overruling his motion for a directed verdict in his favor and (2) in the admission of incompetent evidence against him to which he objected.

Joseph Randolph, from whom the chickens were alleged to have been stolen, testified that he resides upon a farm near Harrodsburg, but how far from the latter place the evidence does not disclose. His dwelling was beside a road known as Oakland Lane, and the yard about his house approached the road and was separated from it by a fence. Near his dwelling was a barn and smokehouse, and running in the grounds at large he had about one hundred chickens. On the 27th of July, which was the second day of the county fair at Harrodsburg, Randolph and his family were away from home, returning near sundown. When Randolph was milking a cow, he heard fowls fluttering, and going to a shed nearby he found two of his chickens with their legs tied together lying in a wagon bed, which was under the covering of a shed. The proof fails to show whether the shed was attached to the barn, or whether at some other place upon the premises, but it was presumably at the barn. After this discovery he made a count of his chickens, and discovered that about thirty-five or forty were gone, which were of the value of seventy-five cents to one dollar a piece. He had not counted his chickens before this for about two weeks. The chickens were Plymouth Rocks, White Leghorns and Rhode Island Reds. Four of the latter variety were missing, but the numbers of the other varieties respectively, which were missing, he was unable to state.

Frank Reed deposed that on a day during the fair, he was cutting weeds and saw a Ford automobile standing in the road in front of Randolph's residence; that he observed it there for about three-quarters of an hour, with its head turned in the direction of the Cornishville pike, and during that time he saw no one near or about the car, but he was unable to state how much longer it had been there. This was about one or two o'clock p. m. When in his work he approached within about thirty feet of the front end of the car, appellant was in Randolph's yard. He came from toward the back side of the house in the direction of the cistern, which seems to have been in the front yard. He asked the witness Reed if he

could get a drink of water, and witness replied that he was not the owner of the property, but supposed that appellant was welcome to the water.   Appellant then drew a bucket of water, but did not drink, and about that time Russell Cloyd came from between the dwelling and smokehouse and picked up the bucket and put it to his lips, and then set it down without drinking.   As the above facts were transpiring, witness had gotten over the fence and was going in the direction of the cistern where the appellant and Cloyd were, for the purpose of obtaining a drink of water himself.  Appellant and Cloyd went hurriedly from the cistern, remarking that it was "hot" and left in the automobile in the direction of the Cornishville pike, which is a way to go to Harrodsburg. The witness did not see any chickens in the car, but was not close enough in his opinion to do so, and before the witness could return to the road after securing a drink of water, the appellant and Cloyd were gone.

Henry Sanders deposed that he saw appellant and Cloyd pass along Oakland Lane in an automobile, within about fifteen feet of him, coming from in the direction of Randolph's place toward the Cornishville pike, but saw no chickens in the car, but the back curtain was fastened and he could not see in the car.

Fred Devine deposed that he was conducting a mercantile business at Nevada, about six miles from Harrodsburg, and that on the third or fourth day of the fair, appellant and Cloyd came together to his place in an automobile, and had sixteen or seventeen chickens tied together and lying in the back of the car, and appellant sold them to him for $12.00 and a few cents in addition. The number of the car was noted down by one present, and this number was given to Randolph when he inquired about it.   The chickens were Plymouth Rocks and Rhode Island Reds, which are common varieties of chickens.   It was further shown by the license number that the car was the property of the step-father of appellant, and with whom appellant lived at that time.

The appellant deposed that he was in Harrodsburg on the second day of the fair, and that Russell Cloyd wanted to take a ride, and that he took Cloyd in the car and went out on the Oakland Lane, when the engine of the car became out of order, and he had to get out and work on the spark plugs, which occurred in the road in front of a place which he has since learned was Randolph's place, and where he was for about twenty min-

utes; that he went into the yard at Randolph's place to get a drink of water, and saw the witness Reed and inquired of him if he could get a drink of water there, but when he and Cloyd started to the cistern, Reed called them and said that the water was not good, and not to drink it, and then he and appellant went and got in the car and came on to Harrodsburg, and arrived there at about 3 o'clock p. m., and stopped the car in front of the office of his step-father and got him and went on to his home out on the Louisville pike. Cloyd was with him until they arrived at the office. He did not see Cloyd next day. On the last day of the fair, he with the assistance of his step-father caught seven or eight chickens at his home, and took them into Harrodsburg to sell them to get money to go to the fair. They were Plymouth Rocks and Rhode Island Reds. He went to two merchants for the purpose of selling them, but the house of each of them was closed, and he met with Cloyd, who proposed that they would go out to Cloyd's home and get some chickens and take them to Nevada and sell the chickens and divide the money; that the store house at Nevada was not closed. This was in the afternoon. He and Cloyd then went to Cloyd's home, who caught seven or eight chickens there and they took them, together with the chickens which appellant had gotten at his home, to Nevada and sold all of them to Devine, at about two or three o'clock p. m. He further deposed that he did not go about Randolph's barn on the occasion he was there, but just went in and got a drink of water.

Ewing, the step-father of appellant, testified that appellant took him home in the car on the afternoon of the second day of the fair at about five or six o'clock, and on every other day of the fair. On Friday, the last day of the fair, Ewing stayed at his home in the afternoon, and at noon when appellant had driven him from his office to their home, and who wanted some money with which to attend the show at the fair grounds at night, and who had some chickens there at home, which his mother had sold to him, with the assistance of Ewing, he caught nine or ten of these chickens and put them in the car and went to town with them. On cross-examination witness, Ewing, was asked if he did not testify as a witness on the examining trial of appellant, and answering in the affirmative, he was inquired if he had stated on that occasion that he had assisted appellant in catching

the chickens, and that they were the chickens which appellant's mother had sold him, and he answered that he did not, because at the examining trial he was summoned and introduced as a witness by the Commonwealth, and that the county attorney made one inquiry of him, only, and that was as to the number of his automobile license; that the defendant did not introduce any evidence, and that he was not asked as a witness anything about the chickens. He was then asked if he did not understand the purpose of the examining trial, and why he did not volunteer the information that he had, and tell the court of it. The last question was objected to and the objection overruled. The witness answered that he was of the opinion that the evidence was insufficient to hold appellant to the grand jury, and that there was nothing further for him to say or do. The witness was then asked, if when he learned that Randolph had secured the number of his automobile license, if he did not offer to pay Randolph for the chickens. The witness answered that he was interested in his step-son and wanted to avoid the necessity of his arrest and trial for such an offense, and that he would rather pay for the chickens than to have that to occur, and for such reason he proposed to Randolph that he would pay for them. That at the time he did not know what chickens the appellant was accused of stealing, but that Randolph was preparing to get out a warrant for appellant, and he wanted to prevent a stigma that such action would place upon the youth. He was asked if he did not say to Randolph, specifically, "Let me pay you for these chickens and settle it right now." This the witness, Ewing, denied. He was furthermore asked why he did not tell Randolph that he was mistaken and explain to him how the boy came by the chickens he sold to Devine, and, if he stated to Randolph that he himself had given the boy the chickens the day he sold them. Witness replied that "I don't know that I said anything to him about it." When pressed to state why he had not given Randolph that information, the questions were objected to and the objection sustained, doubtless upon the ground that Ewing had not deposed that he had given the appellant the chickens, but upon the contrary had stated that the mother of appellant had sold him the chickens. The Commonwealth was permitted to introduce Randolph in rebuttal, and to state what the conversation was with Ewing, and he deposed that Ewing said to him, "I will

pay you for the chickens and settle up right now." Randolph was then asked, "Did Mr. Ewing tell you he gave the chickens to the boy himself?" and he answered, "No, sir." The evidence of this witness in rebuttal was not objected to at the time, but thereafter the appellant moved the court to exclude all of it from the consideration of the jury, which motion the court overruled.

The witness, Reed, being recalled, denied that he said to appellant and Cloyd not to drink the water from the cistern, that it was not fit to drink.

Touching the first ground insisted upon for reversal, that is that the court erred in declining to peremptorily direct the jury to return a verdict of not guilty, it must be confessed, that there was no direct evidence of the fact of the taking of the chickens by appellant and Cloyd. There were circumstances, however, which if the jury believed occurred, pointed to their guilt, and the court was not authorized to direct a verdict of not guilty, except in the absence of any proof of guilt. If the evidence for the Commonwealth is to be believed, the automobile was standing in the road for three quarters of an hour to the knowledge of the witness, and probably for a longer time, without any one's presence near it. It would be inferred, that during this time, the appellant and Cloyd were in the premises of Randolph, about his dwelling and out-houses, where the chickens were, as when Reed arrived in front of the dwelling and started to climb over the fence and go to the cistern for water, appellant was seen by him to come from toward the corner of the dwelling house and Cloyd to come from a direction between the dwelling and smokehouse. No explanation is made of these facts by appellant, except a denial. Appellant inquired if he could get a drink of water, and although he drew a bucket of water and Cloyd raised it to his lips as though to drink, did not do so. Neither did appellant drink. They both hurriedly left the cistern and went to the car and departed as Reed was walking toward the cistern to obtain a drink. The claim of appellant that Reed told him that the water was unfit to drink is denied by Reed, and the fact, if he did do so, that he drank of it himself would seem to indicate that he did not say anything of the kind to appellant. These circumstances would indicate that there was something which the appellant and his companion were attempting to conceal from Reed. The claim of appellant that he was engaged for twenty minutes in fixing his car, and only

went in the premises for a drink of water and was there only five minutes, is disproved by Reed, if the jury believed his statement. The chickens with their legs tied together in the wagon bed under the shed, and found by Randolph when he returned to his home on that afternoon, would justify the inference that the larceny of the chickens occurred on the afternoon that appellant and Cloyd visited the premises, and were for quite a time there, without such actions being accounted for. This circumstance would further justify the inference that the parties taking the chickens were frightened away by an unexpected apprehension of detection. On the next or second day thereafter, according to Devine, and on the second day thereafter, according to appellant, he and Cloyd together sold and delivered to Devine, at Nevada, six miles from Harrodsburg, sixteen or seventeen chickens of the same varieties as those stolen from Randolph. Appellant's claim that his reason for going to Nevada was that the merchants in Harrodsburg had closed their houses, because of the fair, is supported by his statement only, which is a fact, if true, which could have been proven by others. If appellant's mother sold him the chickens which were a part of those which he in turn sold to Devine, such fact could have been proven by her. If Cloyd furnished the other chickens sold to Devine, such fact could have been proven by him or by some member of his family. The fact that neither Cloyd nor appellant's mother, nor any member of Cloyd's family were offered as witnesses, and the failure to do so not accounted for in any way, can not fail to be impressive. From the verdict returned by the jury, it necessarily did not disregard the evidence of the step-father that he assisted appellant at their home, in catching eight or nine of the chickens sold to Devine, but it probably was of the opinion that the remainder of the chickens sold to Devine were those stolen from Randolph, and which the appellant and Cloyd had on the day of the theft concealed at some place in that direction, and on the day of the sale to Devine had gone to the place and secured them before visiting Devine. However, it may have been, the circumstantial evidence of the guilt of appellant required a submission to the jury, which was the judge of the credibility of the witnesses and the weight of the circumstances when proven, and a conviction can be had upon circumstantial evidence as well as otherwise. The appellant does not offer as a

ground for a new trial that the evidence is not sufficient to sustain the verdict, but if such were the fact, the rule must be adhered to that a verdict will not be set aside upon that ground, unless it is palpably and flagrantly against the evidence. Black v. Commonwealth, 154 Ky. 144; Chaney v. Commonwealth, 149 Ky. 472; Wilson v. Commonwealth, 140 Ky. 1; Cloninger v. Commonwealth, 191 Ky. 841.

(b) The objection made by appellant to the question asked of the witness, Ewing, on the cross-examination, after he had testified that he was a witness and testified on the examining trial, and did not state at that time that he assisted the appellant in catching the chickens at his home, which were afterwards sold to Devine, why he did not state such fact to the court, was not well taken. These is no apparent reason why it was improper, under the circumstances to inquire of the witness for his reasons for failing to make the statement which the circumstances apparently demanded, and the reason would shed light upon the credibility of the statement now made by the witness.

(c) The overruling of the motion of appellant to exclude all the testimony of the witness Randolph given in rebuttal, was not prejudicial to the substantial rights of appellant. The witness, Ewing, had denied that he said to Randolph, as the latter was preparing to take out a warrant for appellant "Let me pay you for these chickens and settle it right now." To prove that Ewing had proposed to pay Randolph for the chickens, when the latter was taking out a warrant for appellant, when the witness knew that he had assisted the appellant in catching the chickens, at his home, and that they had been sold to him by his mother, would be competent as effecting the testimony of Ewing, that the chickens were such as he knew the appellant had come lawfully into the possession of, and there can be no doubt that the contradiction of Ewing by the proof of such fact would have been competent evidence. To have contradicted Ewing, however, in the regular way, a foundation for the contradiction should have been laid by asking Ewing if he made the statement to Randolph, and, if denied by him, then to have asked Randolph if Ewing made the statement, with the accompanying circumstances of time and place. The foundation for the contradiction was properly laid, but the inquiry made of Randolph was not whether Ewing had made the specific statement, but

what was said in the conversation. The answer of Randolph, however, went no further than to depose that Ewing did make the statement, and therefore in effect amounted to no more than if the inquiry had been regular. The other statement made by Randolph in rebuttal, that Ewing did not at the time say to him that he had given the appellant the chickens, was the same statement which Ewing himself had made, and did not amount to a contradition, and therefore did not effect his testimony, as Ewing had never made any statement to the effect that he himself had given the chickens to the appellant. These answers of Randolph therefore could not have been prejudicial.

A jury of the vicinage, with a presumed knowledge of the witnesses and of the places mentioned in evidence, arrived at the conclusion that the appellant was guilty, and we do not feel authorized to interfere with the verdict.

The judgment is therefore affirmed.