## Ball v. Commonwealth.

(Decided April 26, 1929.)

140

JAS. S. GOLDEN, LEE & SNYDER and W. A. BROCK for appellant.

J. W. CAMMACK, Attorney General, and J. M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

Appellant was convicted of the offense of voluntary manslaughter, and sentenced to serve 12 years in the penitentiary. As grounds for reversal of that judgment, he claims error in the summoning of the jury; error in refusing a continuance; error in the instructions given; and error in the admission and rejection of testimony, coupled with claimed prejudicial remarks on the part of the court at the time.

In April, 1927, the appellant, Lee Ball, was working for the Louisville & Nashville Railroad on one of its sections near Rhea, Ky. His foreman was Elmer Thomp-

son. Elmer Thompson lived near the station of the Louisville & Nashville at Rhea. The evidence for the commonwealth shows that in the late afternoon of the 7th of April, 1927, and after the day's work on the section was over, Lee Ball, having eaten his supper, went from his home, about two miles up the railroad from Rhea, together with his sons, to Rhea, for the purpose of getting some soy beans. As they passed down the railroad in front of Elmer Thompson's home, the latter was out in the yard talking with a neighbor. He saw the Balls pass. He then walked down from his home to the railroad track, but before he got there he sent his friend, Beckham Stanley, back up to his house to get his pistol, a revolver of .45 caliber. When Thompson reached the railroad track, he and Hamp Hensley engaged in a conversation. Thompson sat down on a rail of the side track with his back to the main track. The Balls having procured the soy beans, each one of them put a two-bushel sack on his shoulder, and started back up the railroad to their home. According to the commonwealth, as they passed Thompson, the latter said to Ball: "Why don't you wait until in the morning and I will haul them soy beans up for you on the car." Ball, who was then about ten or twelve steps away from Thompson, turned around and asked Thompson: "If he wanted it;" and Thompson replied: "What in the world is the matter with you;" and thereupon Ball walked back and said: "It is mighty hard for a man to run over my little children," with which remark he pulled his gun out and shot Thompson as he was seated on the track, the bullets entering the head above and below the eye.

On the other hand, according to the appellant's witnesses, there had been some trouble between Thompson and Ball over Thompson's dissatisfaction with one of Ball's sons who was also working on this section. A quarrel took place at the noon hour of the day of the homicide between Thompson and Ball about this matter. After Ball had left the toolhouse where this quarrel took place, Thompson remarked, in substance, that Ball thought himself a big bully, but that, if Ball "monkeyed with him," he would fill Ball full of lead. The commonweath denied that any such quarrel occurred. Ball's proof also showed that Thompson had a .32 caliber revolver down at the toolhouse, and was accustomed to carrying a gun. This, too, the commonwealth denied. Ball and his witnesses

claim that, as he passed Thompson on his way home with the soy beans, the latter asked him why he was not carrying the beans on his horse. Ball answered that he did not have any horse. As Ball started on, Thompson called something to him, whereupon he turned around and asked Thompson: "What do you want? Thompson said: "I want to settle up with you." Ball replied: "I don't owe you nothing;" whereupon Thompson jumped up off the rail, and, throwing his hand in his right hip pocket, said: "I will settle with you, you G—— d——— s—— of a b——, right here." Then it was that Ball pulled his gun and fired to save his life. There was proof ,offered pro and con on the general reputation of both Thompson and Ball. While the firing was going on, Beckham Stanley was on his way from the Thompson home to the scene of the homicide with Thompson's pistol, but, while still afar off, he saw how things were going, and he turned and hurried away from the place. Appellant does not claim in his testimony anywhere that he was in any apprehension of danger at the hands of Beckham Stanley. In truth, he was not.

Coming, now, to the grounds relied upon for a reversal, it is obvious that we are precluded from examining the first ground relied upon by sections 199 and 281 of the Criminal Code, which read:

"Sec. 199. A challenge to the panel shall only be for a substantial irregularity, in selecting or summoning the jury, or in drawing the panel by the clerk."

"Sec. 281. The decisions of the court upon challenges to the panel, and for cause, or upon motions to set aside an indictment, shall not be subject to exception."

The second ground urged for reversal may be quickly disposed of. Appellant sought a continuance on the ground of the absence of his witness Cull Clem, Jr. He filed an affidavit to the effect that this witness had been duly summoned, but was not present on account of illness, and that, if present, he would testify that a certain witness of the commonwealth who claimed to be an eyewitness of the homicide did not see the homicide, because such witness, at the time of the homicide, was at the store of this Cull Clem, Jr., which was quite a piece away from where the homicide took place. The court refused to

grant the continuance asked, and refused to permit the appellant to read this affidavit as the testimony of Cull Clem, Jr.

A brief history of a part of this prosecution is necessary to show the correctness of the court's ruling. The present trial is the third trial of this case. The first trial resulted in appellant's conviction, with a sentence of 10 years. This verdict was set aside by the trial court. The second trial resulted in a hung jury. The case was then assigned to a day in March, 1928, for trial, but, there not being time for the case then to be tried, it went over to the 23d day of April, 1928. When the case was then called for trial, the appellant asked for a continuance on account of the absence of a number of witnesses, among whom was Cull Clem, and in this affidavit he stated that, "as shown in his first affidavit for continuance," Cull Clem had been summoned, but that the appellant had just received information that he was sick and unable to attend this term of court. The case was continued until the August term of the court, and was set for trial on the 25th day of that month. Again the appellant sought a continuance on account of the absence of certain witnesses, among whom was this Cull Clem, who was not present, due to illness. The court was unable to obtain a jury at this time, and the case went over for trial to the 19th day of September, 1928. At the time the case was thus continued, the court warned the appellant that, if he wished the testimony of this Cull Clem, Jr., he should take his deposition. See Criminal Code, sec. 153. The appellant did nothing so far as this record shows, but again, on September 19th, sought a continuance on the ground of the absence of Cull Clem, Jr., due to his illness.

This simple recitation of the facts convicts the appellant of a total lack of diligence in procuring the testimony of Cull Clem, Jr., and the court did not err in refusing to grant the continuance sought or to permit the reading of this affidavit as Clem's testimony. We may also add that appellant had other witnesses to establish the facts he claimed Clem would have testified to, so that he was not totally deprived of the evidence as to the whereabouts at the time of the homicide of the alleged eyewitness of the commonwealth whom he was seeking to contradict.

So far as the error in instructions is concerned, the only complaint made is with reference to the instruction on self-defense. Appellant insists that this instruction should also have embraced his right to kill Thompson in order to avert the danger to him real or apparent of death or great bodily harm at the hands of Beckham Stanley. The answer to this is that there was no evidence to show that appellant ever thought that he was in any peril from Beckham Stanley. In fact, he was not. Appellant did not claim he shot Thompson or any one in an effort to protect himself against Stanley. Therefore there was no basis for the instruction which he now claims. Kindrick v. Commonwealth, 226 Ky. 144, 10 S. W. (2d) 639; Castle v. Commonwealth, 228 Ky. 151, 14 S. W. (2d) 387.

Coming, now, to the last complaint made, which is with reference to the reception and rejection of testimony, together with the remarks of the court made in connection therewith, we find some six pages of appellant's brief devoted to the errors alleged under this head. Some of them are very trivial, as, for instance, the complaint that the trial court refused to permit one witness to testify that each of the Balls had at the time of the homicide a two-bushel sack of beans on his shoulder. There was not the slightest dispute about this in the evidence. Everybody who testified on the subject testified to that effect, and there was no disagreement about the matter. It is so obvious that this complaint is without merit that it needs no further discussion. There were several questions asked by the appellant to which the court sustained an objection; but, even conceding that the questions were competent, inasmuch as the appellant made no avowal as to what the witness would say if permitted to answer, we are precluded from considering this alleged error. Gregory v. Commonwealth, 187 Ky. 188, 218 S. W. 999.

Appellant also complains of the overruling of his objections to certain questions competent in themselves to which the answers were, however, as he says, plainly incompetent and highly prejudicial. Illustrative of this class of complaint is the following: The widow of the deceased, when on the witness stand, testified that her children were with her on the porch of their home at the time of the homicide, and were witnesses to it. She further stated that some of these children were old enough to

testify in court. She was then asked if they were present on this trial to testify. To this question an objection was interposed, and was properly overruled, as the question was competent. The answer, however, was not entirely responsive to the question. She responded that the children were in the Masonic home. However, the appellant made no motion to exclude this testimony from the consideration of the jury or to strike it from the record. In Simmons v. Commonwealth, 207 Ky. 570, 269 S. W. 732, we said:

"When a question is asked and the question itself is not objectionable, but the answer that is made thereto is objectionable, then the party to whom the answer is objectionable should move the court to strike either the whole, or that part of the answer to which he objects, and when the court rules on his motion adversely, exception should be noted. Thus, when the commonwealth asked the witness Jack Davis about the defendant's general reputation, and Davis answered, 'He is a bootlegger,' the defendant should have moved to strike out the answer and after the court ruled on that motion, should have reserved exception to the ruling, if adverse. It was not sufficient to merely note an objection after the answer was made."

See, also, 16 C. J. 879.

Since the appellant made no motion to exclude the evidence of which he complains under this heading, the error, if any, in its reception is not available to him as grounds for reversal.

Another complaint of appellant is that, when certain witnesses for the commonwealth were on the stand, they were asked on cross-examination if some of their testimony which they had just given on direct examination had been given by them on the former trials of this case. The court refused to permit these witnesses to answer such questions, on the theory that, as these witnesses had never been asked about these matters on the former trial, there was no contradiction between their testimony then and now, and hence the witnesses could not be thus impeached. Proper avowals were made to the effect that they had given no such testimony on the former trials. In excluding this testimony, the court was in error. The purpose of the evidence was, not to contradict the wit-

nesses, but to shake their credibility. See Terhune v. Commonwealth, 196 Ky. 238, 244 S. W. 671. Unexplained, the amplification of their testimony on this trial had a tendency to show bias and such prejudice on the part of the witness as would affect his credibility. Of course, it was open to them to explain that they had not been asked about these matters on the former trial. But, though the trial court erred in excluding this testimony, such error does not call for a reversal in this case, as the error, under the circumstances, was not prejudicial. Inasmuch as the witnesses had not been interrogated about these matters on the former trial, it is very problematical whether their failure to tell then all they told now would have shaken to any great degree their credibility in the eyes of the jury or not. But beyond this the so-called amplification of the witnesses was either on matters concerning which there was no material dispute or which were immaterial or which were fully established by other witnesses. To illustrate, it was complained that the witness Stanley was not required to answer the question whether he had testified upon the former trials that he had been sent to Thompson's house by Thompson to get the latter's pistol. There was no material dispute about this. Indeed, appellant on this appeal, as we have seen, sought to rely upon Stanley's possession of this pistol to establish an error in the self-defense instruction. This complaint of the appellant must be disallowed.

It is next claimed that the trial judge at least on three different occasions hurt the appellant's case very much by remarks which he made. The first of these occasions was when the appellant was endeavoring by his cross-examination of Beckham Stanley to show how Stanley was carrying, at the time of the homicide, the gun for which he had been sent by Thompson. This was totally irrelevant and immaterial, as the appellant did not claim that he was in any danger or fear of danger at the hands of Beckham Stanley. The court, in bringing to a close the further examination of Stanley along this line, stated that Stanley was not on trial for this crime. We cannot comprehend how this was prejudicial to any substantial right of the appellant.

The next occasion was when the appellant was on the stand and was asked by his counsel how much the soy beans, which appellant had on his shoulder when he shot Thompson, weighed. The court, in sustaining an objec-

tion to this question, said: "Do you want to know how new bean stalks grow—you are just taking up time. Go ahead and try to confine yourself to things material in this case, please. The court does not want to be unreasonable about these things but I want you to confine yourself to things that are material in this case, and I insist on that. That is final."

When this remark was made, appellant's counsel had already examined him at great length about these beans. About three pages of the transcript are taken up with this examination. There was not the slightest question in this case about the appellant carrying a two-bushel sack of beans on his shoulder at the time of the homicide. The jury knew as men of common sense that a two-bushel sack of beans was of some bulk and weight, and there was very little, if any, excuse for the appellant going to such lengths as he did on his examination about these beans. The jury knew that their time and that of the court was being consumed to establish an admitted point. Although the court might better have omitted the remark about the growth of new bean stalks, yet, taking his statement as a whole, the jury knew that the court was trying to do no more than confine counsel to the disputed issues in the case and expedite the trial. It gave no hint of bias or prejudice on the part of the judge as to the merits of the case. There is no merit in this contention of appellant.

The third occasion was when the appellant was still on the stand. He was asked on cross-examination certain questions about a map of the scene of the homicide which had been drawn upon the floor. The appellant claimed that the side track on the rail of which Thompson had seated himself just prior to the homicide was not correctly drawn. The commonwealth's attorney then asked him to sketch in the side track as nearly as he could. Thereupon appellant's counsel objected, and the court sustained the objection. The commonwealth's attorney did not understand the ground of the objection, whether it was based on appellant's unwillingness to draw the side track or on his inability to do so. He therefore asked the court on what ground the objection was based. The court replied: "I don't think he wants to and possibly he can not, I don't know." Turning to the appellant, the court immediately added: "The question is whether or not you can sketch it," and the appellant

answered: "I can not." As a matter of fact, whether the side track was straight or curved, or how it actually lay on the ground, shed absolutely no light on the issues in this case. It is very evident that the court was not by the remark he made trying to intimate any opinion that the witness was trying to conceal anything, but was only trying to answer the commonwealth's attorney's question as to appellant's reason for the objection he made. This is made manifest by the court at once asking the appellant if he could make the sketch, when the witness replied that he could not.

There are other objections made, but they are so minor in character, and so without merit, that they need not be discussed at length. Suffice it to say that we have carefully considered them seriatim as set out in appellant's brief, and find none of them which warrant a reversal of this judgment, and it would incumber this opinion to take them up, without any benefit to the profession. Perceiving no error prejudicial to the appellant's substantial rights, the judgment is affirmed.