## Eaton v. Commonwealth.

(Decided May 31, 1929.)

252

JAMES S. GOLDEN and B. B. GOLDEN for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

Affirming.

In a drunken brawl on Sunday, October 2, 1927, Clarence Eaton slew his erstwhile friend, Daniel Gray, and upon his trial, under an indictment for murder, he was found guilty of manslaughter, and his punishment fixed at five years' confinement in the penitentiary.

This homicide occurred at a mining camp in Bell county that is known by the name of Roth. According to the evidence of Mrs. Odie Gray, the widow of the slain man, Eaton saw her in this camp about 3 or 4 o'clock that afternoon. He was drunk, cursing, staggering, and was asking for Dan Gray. She explained to him that he had gone to the country with her mother. He then asked when Dan would return and how he would return, and said, "I have to see Dan by G——. I have to make a round with him." The next we learn of Eaton was about 7 o'clock when he and Ed Hopkins called at the home of Mr. Tom Collett, where Gray and his wife lived, and was inquiring for Gray. Mrs. Collett and Mrs. Gray had retired. Eaton was drunk and staggering about over the room, holding to the mantle and to the bed. They told him that Gray was at Harvey Leith's and described Leith's house to Eaton so that he could know it. It seemed that Eaton thought he had some business with Leith also, because he remarked, "By G——, I have a round with him and I have to make it after I find Dan Gray." He also said that he would want a bed after he made his round with Dan. Eaton and Hopkins were also asking for Taft Horn, whom they regarded as a probable source of obtaining some liquor. They explained to him that Taft Horn was also at the Leith home. So Eaton and Hopkins started for the Leith home. They found Gray and Horn and the liquor. There was a Victrola at this home, and they were playing that and dancing. Eaton knocked on the door and asked to be admitted. He was not admitted as promptly as he thought he should be, and, announcing himself as "Big Boy," he threatened to kick the door down. Some one opened the door and he made his formal entry by falling, sprawling into the room, but succeeded in rising, and subsequently did the Charleston. Finally his condition became such that he wanted to lie down. Mr. Leith took him into the front room for that purpose; he did not stay but said he wanted a drink and went through the family room where they were dancing, into the kitchen for the purpose of

getting a drink. While in there, he got into a scuffle with Dan Gray and killed him. After killing Gray, he had Gray's pistol, and his account of this homicide is that when he got in there he got into trouble with Gray, that Gray pulled his pistol and pushed it up against Eaton and said, "If you move, I'll shoot you in two." Eaton says he grabbed Gray's pistol and tried to take it away from him and could not, whereupon he pulled his own and shot Gray. Eaton says no one was present but him and Gray. According to the witnesses for the commonwealth, Gray's pistol had been taken away from him early in the evening and had been put outside on the porch, and Gray was unarmed at the time he was killed. The theory of the commonwealth is that Eaton picked up this pistol off the front porch while he was waiting to be admitted. Gray lived but a short time. Before he died, he stated, *"Clarence Eaton has killed me with my gun and I am dying, he shot me through and through for nothing. I did not have my gun. Eaton has it. Go and get it."* Eaton himself testified that Gray said just after he was shot. *"You have shot me square through."* The court admitted this dying statement, but said to the jury: "The statement that the witness made as to what Dan Gray said about 'He killed me for nothing' or 'shot me for nothing' you will not consider. That is withdrawn from you in this case. The part about the pistol will remain with you and is not withdrawn."

There were other accounts of the killing. George Collett testified that he heard some wrestling, came back to the kitchen door and saw Dan Gray and Clarence Eaton in a struggle. He saw Eaton with what looked like a pistol, against Dan's left side; about that time the gun fired; that he did not see anything in Dan Gray's hands; could see their hands to a certain extent, but not well.

Taft Horn testified he was in the kitchen, that when Eaton came into the kitchen he walked up and took Dan by the shoulder and said, "By G—— quit. I am running this thing. If you move I'll shoot you in two." Dan said, "Don't hurt me, Clarence, I don't want any trouble." Eaton jerked him around and fired. He only saw one pistol, and Eaton had that.

Hazel Leith testified she saw this killing; that Dan Gray told Taft to go home. Eaton put his hand on Gray's shoulder and said, "G—— d—— it, he will go home when I tell him. I am running this." Gray said,

"Clarence, I didn't come here to have trouble," and Eaton grabbed him and shot him.

After he was convicted, Eaton filed 10 different grounds upon which he sought a new trial, but his motion therefor was overruled. One of his grounds is that, after the jury had been selected and sworn, the case was stated for the commonwealth and in that statement it was said: *"The commonwealth will show by one witness that Gray had previously given his pistol to this witness and was unarmed at the time of the difficulty."* At the conclusion of the statement of the case for the commonwealth the defendant by his counsel stated to the court that the defendant was surprised by that statement; that there had been a rather full preliminary examination at the examining trial; the testimony was taken by the court stenographer and had been transcribed; that the defendant had depended upon meeting the things and only the things contained in the transcript of that testimony; that no such evidence was given on the examining trial; and that the defendant would be greatly prejudiced if compelled to go into trial without an opportunity or time to investigate and to be ready to meet and rebut this proposed testimony as to Gray's being unarmed, and he therefore moved the court to set aside the swearing of the jury and continue the case. His motion was overruled, and he alleges this was error. This court it not permitted to reverse a judgment in a criminal case merely because an error has been committed, but it must appear that the error is prejudicial. See sections 340, 353, Criminal Code of Practice. Nor can we reverse a judgment because we think a prejudicial error may have been committed. The presumption in favor of the regularity of the proceedings in the trial court must prevail, and, to entitle a defendant to a reversal, prejudicial error must affirmatively appear. See Pitts v. Com., 227 Ky. 792, 13 S. W. (2d) 1053. Now, how could Eaton have manifested that prejudicial error was committed in overruling his motion for a continuance? The answer is evident. He could have done so by filing his affidavit for a continuance, setting out his surprise, and setting out in substance what the evidence was upon the examining trial, and how and by what witnesses he proposes to rebut the alleged new evidence. This court cannot know what that evidence was, nor did the trial court know. There was but one way that that evidence could be brought to the knowledge of the trial court and this court, and that is by making it a part of this record in

some way. This he wholly failed to do. Now, it may sometimes happen that upon the trial of a case something prejudicial to the substantial rights of the defendant may occur, and, if that happens in the presence of the trial court so that the court knows just what has occurred, it would not be necessary that the matter be set out by affidavit; but ordinarily the motion or application for a continuance must be supported by an affidavit, and especially is that true where the facts whereon the defendant bases his motion have not occurred in the presence of the trial court. See 16 C. J. 497, sec. 913. We find among the opinions of this court cases wherein this court has reversed judgments where the defendant had sought a continuance and had filed proper affidavits therefor, and we find cases wherein this court has affirmed judgments where the defendant had not filed proper affidavits. For example, the court affirmed the case of Clark v. Com., 58 S. W. 429, 22 Ky. Law Rep. 517, and Kelly v. Com., 165 Ky. 483, 177 S. W. 249, in neither of which cases was the motion supported by affidavit, but the court reversed the judgments in the cases of Johnson v. Com., 107 S. W. 768, 32 Ky. Law Rep. 1117; Day v. Com. (Ky.) 120 S. W. 297, and Lowery v. Com., 119 Ky. 691, 63 S. W. 977, 23 Ky. Law Rep. 1240, wherein proper affidavits had been filed. Of course, this Lowry Case was overruled in the case of Meade v. Com., 214 Ky. 88, 282 S. W. 781, but it was overruled on another point. Moreover, it is stated in 16 C. J. 486, that the defendant must disclose the manner in which he expects to meet the new phase of the evidence, and the defendant here makes no suggestion how he expects to meet this or whether he will ever be able to meet it. If this case had been continued to the next term, so far as this record discloses, this defendant would have been in the same condition then that he was at the time he was tried, and, according to him, the only way he could be fairly tried would be to continue this case until the witnesses for the commonwealth had died, then he would be ready to go to trial, but he was not entitled to that accommodation.

His next complaint is of errors of the court in the admission and rejection of evidence, and, according to Eaton, this record fairly bristles with such errors. To consider all these alleged errors would extend this opinion to a very unusual length, but these alleged errors fall into certain well-defined classes, and we shall take up and dispose of one claimed error of each class, and our ruling on that objection shall apply to all similar ones.

(a) Jessie Evans, a witness for the defendant having testified that he had heard Hazel Leith talking shortly after the killing, was asked if she did not say this, "Big Boy (that is Eaton) has killed Dan Gray and George Collett is in it too. George Collett was the cause of it and I aim to prosecute him." The commonwealth objected, and the court properly sustained the objection, because Mrs. Leith's feelings toward George Collett was a collateral matter, and, when the defendant asked her about this remark and she said it was not made, the defendant is bound by her answer.

(b) The defendant called the stenographer who had taken the evidence at the examining trial and he asked her to examine the testimony given by Mrs. Odie Gray on the examining trial and to state to the jury whether or not Mrs. Gray made any statement on that trial that she met, saw, or talked with Clarence Eaton the evening of the killing any time before night and especially between the hours of 2:30 and 4 o'clock. The commonwealth objected to this question, and the court properly sustained the objection. By the provisions of section 597 of the Civil Code of Practice a witness may be impeached by showing that he has made statements different from his present testimony, but by the provisions of section 598 it is provided that, before that can be done, grounds therefor must be laid, and *that had not been done.* These provisions of the Code apply just as much to a statement a witness may have made in court as to a statement a witness may have made anywhere else.

(c) During the cross-examination of the widow of the slain man, she was asked this question: "On the examining trial did you state anything about your husband telling you he did not have any gun? The commonwealth objected, and the court sustained the objection. The object of this question was to affect the credibility of Mrs. Gray as a witness and to test the strength of her memory. She should have been required to answer the question. See Terhune v. Com., 196 Ky. 238, 244 S. W. 671, and Ball v. Commonwealth (Ky.) 16 S. W. (2d) 793 229 Ky. 139. The defendant avowed that, if she should be required to answer, she would have truthfully said. "I don't remember." The defendant alleges that not requiring her to answer was error and we agree with him, but he has not yet shown it was prejudicial error. In order to show that this was prejudicial error the defendant's avowal would have to go further and show that

she was asked such a question and had given a different answer from what her evidence was on this occasion, or else had willfully concealed what she knew on the subject.

This, which is taken from the case of State v. Robinson, 52 La. Ann. 616, 27 So. 124, seems very much in point: "The district judge, in his reasons for refusing a new trial, states that the witness on trial of the cause stated a fact which had not been stated by him when he gave his testimony before the coroner; that the district attorney appeared surprised and expressed surprise thereat. But we do not think that that simple fact authorized the district attorney to read before the jury the whole evidence which the witness had given at the time of the inquest, or to attempt to discredit the witness by reason of that fact. The witness may not have been questioned as to that point by the coroner, and his testimony before the jury may have been perfectly trustworthy and truthful."

(d) During the cross-examination of Mrs. Lilly Collett, the mother-in-law of the slain man, she was asked if she had said to Mrs. Jim Smith: " 'I want you to swear that Clarence Eaton was down on the railroad with two pistols in his hands swearing that he would kill everybody in the camp.' And did she say to you she could not do that, then did you say to her, 'I want you to state that whether you swear it or not.' " The commonwealth's objection was sustained. Defendant excepted, but made no avowal of what the answer of the witness would be. Nevertheless, Mrs. James Smith was introduced and was asked about this conversation and stated that Mrs. Collett did make that statement to her, so the defendant, having gotten the benefit of that, cannot complain.

(e) When the widow of the dead man was on the stand, she was asked if she did not, the Saturday before, say to W. H. Conkins that any one going on the stand in this case, who did not swear like she wanted them to, she would whip them before they got out of the courthouse. The court sustained the commonwealth's objection. The defendant alleges that that was error, but the answer to that question, whether it had been yes or no, would have thrown no light on the question the jury was trying. It would neither have proven nor disproven that Clarence Eaton was guilty. It was a collateral matter. The most that it could have done would have been to have shown the feeling of his widow, and she would have been a strange widow indeed, if her feelings toward the man

that killed her husband had been anything other than unkind.

(f) On his direct examination by the commonwealth Taft Horn was asked if Eaton made any statement to him just after the killing and, if so, what it was. Horn answered, "I was standing on the back porch. He was out there and told me if he knew I had a gun he would kill me." No motion was made to exclude this answer. The question was competent, and, as no motion was made to exclude the answer, defendant cannot complain of the answer, but, as this happened just immediately after the killing, we are not prepared to say it was not a part of the res gestae. It showed Eaton's frame of mind. He had just killed one man, and, according to this statement, he would have killed Horn too if he had thought Horn had a pistol. Such statements are admissible as a part of the res gestae, where they are so closely and intimately connected with the killing as to be in a sense, a part of it. See section 498, Robinson's Crim. Law & Procedure.

(g) In the cross-examination of Hazel Leith, the defendant asked her this question: "Were you down there in the presence of Gladys Dozier in a drunken condition, staggering back and forth?" She answered, "No sir, me and my husband were going to get Dan Gray's sister and baby." The latter part of this answer was not responsive to the question, and, if the defendant had moved to exclude it, the court should have done so, but the defendant did not do that, and on redirect examination the commonwealth asked her whose baby she meant. The defendant objected, and the court sustained the objection, but the witness answered anyway, and thereupon the defendant moved the court to admonish the jury not to consider this answer. The court overruled that motion. The court should have excluded this answer, but excluding this answer and leaving in the record the answer first quoted would have left the defendant in just as bad condition as he was with this answer in there, so the defendant was not prejudiced by the last answer being left in there when it conveyed to the jury no more information than the jury had already obtained by her first answer; hence the defendant was not prejudiced.

The defendant complains of misconduct of the employed attorney for the prosecution, because in his closing argument he said, "*This woman put in black, that baby brought up, without any knowledge of her father.*" He makes further complaint of misconduct of this attor-

ney, in that he said this in his closing argument: *"This is just one more murder trial after another that has been tried here and dramatized in this jury stand."* And further: *"Knowing that he was going to die, with the death frost gathering on his lips, looking through that mist where the mind is half way between this sphere and that country of which we do not know, he gasps out to his people and told them, 'I had no pistol to shoot him. He shot me through and through.' "* The defendant objected to all these remarks, and his objections were overruled, but that was not erroneous, because we have often said that attorneys have a right to quote from the evidence in their argument to the jury and to use all their persuasive powers. A portion of these remarks refer to common history, which was known to the jury; the other parts were fairly sustained by the evidence, and this was within the bounds of legitimate argument.

Defendant is complaining of the admission of the dying declaration, but we do not find merit in his complant. This declaration is short. It begins with the statement that Clarence Eaton had killed him and that he was dying. We are unable to imagine what further qualification was necessary. The man knew he was dying, said he was dying, and did presently die. Of course, there were things in this declaration prejudicial to the defendant. In fact, every bit of hostile evidence was prejudicial to the defendant; still evidence cannot be excluded merely because it is prejudicial. To constitute reversible error, admitted evidence must be both prejudicial and inadmissible. If it is to be excluded at all, it must be excluded because it is for some reason incompetent or inadmissible, and this declaration made under the circumstances that it was, was both competent and admissible.

> "The person injured by the crime, whether alive or dead, is in no sense a party to the prosecution, and therefore his statements and declarations are not evidence either for or against accused, unless they are relevant on the question of defendant's guilt and were made in his presence, or unless they are admissible as part of the res gestae, as dying declarations, or as threats." 16 C. J. 639.

This man lived only a few minutes after he was shot. What he said was said almost immediately after he was shot, and a portion of it was said in the presence of the defendant. We think it was properly admissible as a

part of the res gestae. We have approved the admission of similar statements in other cases. See Spencer v. Com., 194 Ky. 699, 240 S. W. 750; Howard v. Com., 70 S. W. 295, 24 Ky. Law Rep. 950; Shotwell v. Com., 68 S. W. 403, 24 Ky. Law Rep. 255; Stephens v. Com., 47 S. W. 229, 20 Ky. Law Rep. 544, and Norfleet v. Com., 33 S. W. 938, 17 Ky. Law Rep. 1137. In fact, the Norfleet case can hardly be distinguished from this one, and the same is true of Rogers v. Com., 161 Ky. 754, 171 S. W. 464; but whether admissible as part of the res gestae or not this declaration was certainly admissible as a dying declaration. Of course, the statement, ''shot me for nothing,'' was not admissible, and that was excluded from the evidence by the court.

At the conclusion of all the testimony the court admonished the jury that *the testimony of all witnesses contradicting the statement of other witnesses, and the testimony of all of the witnesses impeaching the general moral character and the reputation for truth and veracity of other witnesses will not be accepted as substantive testimony, but only for the purpose of going to the credibility of the witness contradicted, and the witness about whose character for truth and veracity said witnesses testified, if in the opinion of the jury the testimony did discredit said witness.* Defendant insists that this admonition was insufficient because it failed to give the names of the witnesses contradicted, and therefore, as he says, falls short of protecting the substantial rights of the defendant. If he had wanted an admonition given every time some witness was contradicted, he should have asked the court for such, and he did not do so. Moreover, he should have pointed out in his brief those parts of the record where he insists particular admonitions should have been given, and he has not done so. The court gave a blanket admonition, and in complaining of it, in this court the defendant has made a blanket complaint. The trial court dealt as fairly with him as he has dealt with this court. In the recent case of Mitchell v. Com., 227 Ky. 512, 13 S. W. (2d) 508, we passed on this question, quoting from the case of Decker v. Com., 195 Ky. 64, 241 S. W. 817. If a defendant fails to ask the trial court to admonish the jury to consider testimony only for certain purposes, then he has waived that right. The honors were about even in this case, because both the commonwealth and the defendant introduced impeaching and contradicting evidence, so that the defend-

ant gained perhaps as much as he lost by the court's failing to give the names of these witnesses in the admonition. A jury is presumed to be composed of men of average intelligence, the presumption is they understood this admonition, and, without our attention being called to the specific instances where he thinks a specific admonition should have been given, we must regard the general admonition given by the court as amply sufficient to have fully protected the defendant's rights in the premises, especially in view of the fact that the defendant failed to ask for specific admonition at the time and fails to call to our attention in this record the instance where he contends he was entitled to have the court so admonish the jury, and his motion was overruled.

He calls attention to one question that was asked the commonwealth's witness, Jack Smith: "Did he state to you in words or substance displaying the pistol, that there was a pistol, he didn't know whose it was or how he came with it?" The defendant objected, his objection was overruled and he excepted. The witness answered, "Yes sir, he did." This admission by the defendant against his interest was direct substantive evidence against him, and Smith could have been asked that question in chief before the defendant ever testified; in fact, could have been asked it regardless of whether the defendant testified or not. This question is thoroughly discussed and settled in the recent cases of Berry v. Com., 227 Ky. 528, 13 S. W. (2d) 521 and Oney v. Com., 225 Ky. 590, 9 S. W. (2d) 723.

The defendant sought to ask this witness the further question: "In that same conversation that you speak of, did he say anything else there about the killing? Didn't he at that same time say he had killed one of the best friends he had? He hated to do it but that he had it to do?" The commonwealth's objection to that was sustained. The defendant excepted and avowed that if the witness were permitted to answer he would truthfully answer, "Yes." The defendant alleges that the exclusion of this was error, but the matter which he sought to introduce was merely a self-serving declaration. The defendant testified at great length, and his testimony which the jury heard from him was to the same effect. The most that the admission of this would have accomplished would have been to show he had made to Smith the same claim he was making before the jury. In other words his

claim is the jury should believe his evidence on this trial because he had made a similar statement to Smith. This is so immaterial, its exclusion did not prejudice defendant.

The defendant complains that his counsel was harshly treated by the court and his case was thereby prejudiced. Basis for this argument is that during the cross-examination of Mrs. Gray he had asked her if she had not stated in the presence of Mrs. Conkins that she intended to whip any witness that did not swear like she wanted them to. The commonwealth objected and the court said: "This is improper and prejudicial in this case, the motion sustained." Thereupon counsel for the defendant said: "I feel that the court has criticised me in a spirit that may hurt the man's case, I know I am trying to practice honorably and under my oath, if this is not a proper question, and I think it is, the court has to pass on that, I give the court the right to do that, I don't think I should be talked to that way in the presence of the jury where this man is on trial for his life." Perhaps the court said more than he should have said, so did counsel for defendent, but we are unable to see in what the court said anything that prevented the defendant from securing a fair trial.

Another objection of this same nature is this: The defendant on cross-examination asked Mrs. Gray this question: "On the examining trial, did you state anything about your husband telling you he did not have any gun?" The commonwealth objected, and the court sustained the objection. The defendant excepted and offered to make an avowal that the witness, if permitted to answer, would say, "No I did not state that." Whereupon the court remarked that to put an avowal in this record about what the witness is going to state is not proper and said: "You can interrogate this witness privately and see whether this avowal is correct or not. If she made any such statement in the record counsel for the defendant may interrogate her on the question and answer." Thereupon the defendant objected and excepted to the ruling of the court and avowed that, if the witness were permitted to answer, she would truthfully say, "I do not remember." The record does not show, but as the defendant had offered to avow, first, that her answer would be she did not state this, and, second, that her answer would be that she did not remember, the reasonable inference is that he had asked her privately as

the court suggested and that her answer was she did not remember and the court allowed that answer, "I do not remember," to remain in the record. The defendant then moved to submit to the jury the record of Mrs. Gray's testimony at the examining trial, and the court overruled that motion, and defendant excepted. We do not see in this any harsh treatment of defendant's counsel that prejudiced his case. Technically, the correct way to make an avowal is to ask the witness privately what her answer would be to the question, and let that answer be avowed into the record, and, because the court insisted on its being done in that way, was not equivalent, as defendant contends, to charging his attorney with placing in the record an avowal which was not true.

Further, the defendant asked Mrs. Hazel Leith how much liquor was there at the scene of the killing and how much liquor the witness Collett had. The commonwealth objected. The court sustained the objection and said, "I think it is immaterial how much liquor they had." Defendant excepted. Again the court perhaps went too far, and that all that should have been said was that the objection was sustained. There was evidently plenty of liquor. The proof by two witnesses was there was about a pint, and evidently many of the party were under the influence of liquor. The condition of these witnesses was a proper subject of inquiry, and as it was shown that they were drinking, it was immaterial how much surplus or unconsumed liquor they had, and, on the whole, we do not see anything in the treatment of defendant's counsel by the court that amounts to prejudicial error. When we compare this treatment with that treatment criticized by this court in the case of Massie v. Com., 24 S. W. 611, 15 Ky. Law Rep. 562, the difference is very evident. There the court said that he was getting tired of being humbugged and bamboozled by the counsel for the defendant, and that he had stood this as long as he intended to. Nothing occurred on this trial which came up to that.

Both court and counsel should remember that both are sworn officers of the law and should conduct themselves with dignity and decorum, should respect each other's rights, and never forget their high and important positions, and we shall never hesitate to reverse a case where the court has so treated defendant's counsel as to humiliate him or to bring him into disrepute; but nothing said or done here amounted to that. In the case of Fuqua v. Com., 118 Ky. 578, 81 S. W. 925, 26 Ky. Law Rep. 420,

the court interrupted the cross-examination and said: "I think this cross-examination has gone far enough. It is immaterial anyway." Now, the word "immaterial" as there used referred to the entire cross-examination, yet we held that was not prejudicial.

By section 593 of the Civil Code of Practice the court is given a very broad discretion in controlling the examination of witnesses, and with that discretion we will not interfere, unless its abuse is made manifest. See Dean v. Com., 78 S. W. 1112, 25 Ky. Law Rep. 1876. In the case of Searcy v. Com., 188 Ky. 422, 222 S. W. 513, in his closing argument the commonwealth's attorney made the statement that the deceased had ordered Searcy out of his house. The counsel for Searcy objected and said there was no proof that he was ever ordered out of the place, whereupon the commonwealth's attorney replied that Martha Barber testified that he had ordered him out. The court then said, "That is correct." The record failed to show that Searcy had been ordered out, and we held that remark by the court was prejudicial, but that is very different from what occurred here.

The next thing the defendant relies on for reversal is alleged misconduct of the judge which consists in this: The jury came in and announced that the members could not agree, and one of them stated that he believed if the circuit judge would explain the instructions to the jury they might be able to agree. The jury took their seats in the jury box, and the court took the written instructions in the case and read them over to the jury, and explained them. The defendant insists that this explanation amounted to oral instructions to the jury, and by the bill of exceptions it appears that the court said this, in explaining the last instruction: *"If the jury have upon the whole case a reasonable doubt of the defendant having been proven guilty, that it was their duty to find him not guilty, that said instruction might be regarded as an extension of the instruction on self defense and that if the jury entertained a doubt as to the defendant's guilt, they should acquit him."* The court, in explaining instruction No. 1 and instruction No. 2, told the jury that, if they should believe from the evidence that the defendant shot and killed the deceased, Dan Gray, with his malice aforethought, they should find him guilty of the crime of murder, but, if they should believe that the shooting occurred in the sudden heat of passion, they should find him guilty of manslaughter, or, if they entertained a doubt as to

*which crime he had committed, they should find him guilty of manslaughter only. The court further said to the jury that both he and the parties to the suit would regard it as a favor if the jury would consider the case further and try to make up a verdict.* We do not approve of the court's action in this matter. He should have done nothing further than read the instructions, but the defendant is not entitled to a reversal of this judgment unless he shows that in what the judge said there was something prejudicial to the defendant, and we are unable to see anything in what he did say that prejudiced the defendant's rights.

The defendant, in his criticism of the action of the court, says that the court in its comments on instruction No. 1 and instruction No. 2 did not require the jury, before convicting the defendant, to believe that he had been proven guilty by the evidence beyond a reasonable doubt, but, from reading what the court said above, it will be seen that the court told the jury, if they entertained a doubt as to the defendant's guilt, they should acquit him. This was more than the defendant was entitled to. He is not entitled to an acquittal merely because the jury entertained some chimerical doubt, but is only entitled to an acquittal when the jury entertains a reasonable doubt, and he was in a better position when the court told the jury to acquit him if they entertained "a doubt" than he would have been if the court had told the jury to acquit him if they entertained a reasonable doubt of his having been proven guilty. The expression, "a doubt," included every form of doubt, reasonable as well as chimerical, whereas he was only entitled to an acquittal if the jury entertained a reasonable doubt of his having been proven guilty. Eaton admits this homicide. He had but one excuse for it, and that was that he acted in his necessary self-defense. The jury might have believed his account of it and yet failed to believe that he was in any danger. According to him, he and Gray were struggling over Gray's pistol, and both had hold of it. The proof shows that Gray was a man who weighed 136 pounds, whereas the proof showed that Eaton was a giant when compared to Gray. Eaton was six feet three inches tall, weighed 171 pounds, and struts across the pages of this record calling himself "Big Boy." The jury might have believed that, if he had wanted to, he could easily have dispossessed Gray of his pistol, if he had one. His own

evidence shows that with one hand he was able to prevent Gray's shooting him, and the jury might have believed that, if he had used both hands, he could have wrenched his pistol away from Gray. Before defendant is entitled to an acquittal on the ground of self-defense, he must have reasonable grounds to believe, and in the exercise of a reasonable judgment must believe, that nothing less than the slaying of his adversary will save him from death or great bodily harm. Eaton's own evidence shows that with one hand he was able to prevent Gray's shooting him, and the jury may have believed everything Eaton said about this difficulty, and yet may on his own evidence have believed that this homicide was unnecessary and inexcusable. Ordinarily the relative strength and size of the parties does not affect one's right of self-defense where deadly weapons are used (30 C. J., page 65, note 65), but we would not regard that rule as applicable where the slayer had seized the deceased's weapon, and had demonstrated his ability to prevent his use of it.

Finding no prejudicial error in the record, the judgment is affirmed.